PSE CONSULTING, INC. *v.* FRANK MERCEDE AND
SONS, INC., ET AL.
(SC 16839)

Borden, Norcott, Katz, Palmer and Vertefeuille, Js.

Argued September 9, 2003—officially released January 13, 2004

*R. Bradley Wolfe*, with whom were *Mary Anne A. Charron* and, on the brief, *Durwin P. Jones*, for the appellant (defendant National Fire Insurance Company of Hartford).

*Raymond A. Garcia*, with whom were *Frederick E. Hedberg* and, on the brief, *Jane I. Milas*, for the appellee (named defendant).

*Matthew M. Horowitz* filed a brief for the Surety Association of America as amicus curiae.

*Opinion*

KATZ, J. This appeal concerns the rights of a surety, pursuant to an indemnity agreement, to indemnification for payments made in settling a claim against a surety bond. The sole parties in this appeal are National Fire Insurance Company of Hartford (National) and Frank Mercede and Sons, Inc. (Mercede), the two defendants in the underlying action.[1] National, a commercial surety company, appeals[2] from the judgment of the trial court, rendered after a jury trial, in favor of Mercede on National's cross complaint seeking indemnification and on Mercede's counter cross complaint seeking damages arising from a breach of the implied covenant of good faith and fair dealing.

On appeal, National claims that the trial court improperly: (1) disregarded the terms of an indemnity agreement executed by National and Mercede by instructing the jury that National had the burden of proving, as an element of its claim for indemnification, that its payments to the plaintiff, PSE Consulting, Inc. (PSE); see footnote 1 of this opinion; pursuant to a

---

[1] The plaintiff in the underlying action, PSE Consulting, Inc., settled with both National and Mercede before trial, and is not a party to this appeal.

[2] National appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

payment bond were proper; (2) failed to direct a verdict for National when the jury improperly found that National's payments to PSE had not been made in satisfaction of PSE's claim under the payment bond; (3) instructed the jury concerning the implied covenant of good faith and fair dealing; (4) admitted into evidence an e-mail message protected by the attorney-client privilege, as well as testimony pertaining to a settlement agreement between National and a third party unrelated to this action; (5) submitted Mercede's special defenses of waiver and estoppel to the jury, and refused to direct a verdict for National as to those special defenses, when the jury reasonably could not have found for Mercede; and (6) refused to set aside the verdict when the jury inconsistently had found that National had breached the implied covenant of good faith and fair dealing but not the indemnity agreement. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In October, 1996, National and Mercede executed a general agreement of indemnity (indemnity agreement), whereby National agreed to issue surety bonds on Mercede's behalf, and Mercede agreed to indemnify National for any expenses that National might incur as a result of issuing those bonds. In May, 1997, Mercede was hired as a general contractor to construct an assisted living facility in Stamford (project). As security for the contract, Mercede furnished the owner of the project with a labor and materials payment bond (payment bond). The payment bond was issued by National, on behalf of Mercede as the principal and in favor of the owner as obligee, whereby National and Mercede agreed to be jointly and severally responsible for the payment of all labor, materials and equipment furnished for use in the construction of the project.

Mercede executed a written subcontract with Dominion Bridge, Inc. (Dominion), for the manufacture and erection of structural steel. Dominion, in turn, entered into an oral sub-subcontract with PSE, whereby PSE agreed to erect steel structures for $1.5 million. This sub-subcontract between Dominion and PSE was never reduced to writing, however, and PSE never executed a formal subcontract with Mercede.

PSE began work on the project in November, 1997. Soon thereafter, PSE became concerned about the volume of work that it was performing on the project, and sought further assurance that it would be paid for that work. Consequently, PSE, Dominion and Mercede executed a joint check agreement, whereby Mercede agreed to issue checks made payable jointly to Dominion and PSE in satisfaction of their sub-subcontract. The joint check agreement provided that Mercede would pay for amounts "up to the contract amount [of $1.5 million], plus any extra charges determined and agreed upon subsequent to the date hereof." This joint check agreement also provided for a retainage of 10 percent.[3]

Between January and August, 1998, PSE continued to work on the project and to submit invoices to Dominion. Dominion then forwarded the invoices to Mercede, and Mercede issued joint checks pursuant to the joint check agreement. A representative of PSE signed a release form upon receipt of each joint check, whereby PSE waived any potential claims it may have had against Mercede. At the time of Mercede's final payment under

---

[3] In construction parlance, the term "retainage" ordinarily refers to the percentage of the contract price that a project owner may withhold from a contractor pending completion and acceptance of the contractor's performance under the terms of a construction contract. See *F & W Welding Service, Inc.* v. *ADL Contracting Corp.*, 217 Conn. 507, 508, 587 A.2d 92 (1991). The joint check agreement in this case provided for retainage of 10 percent of the $1.5 million contract price, or $150,000.

the joint check agreement on July 20, 1998, Mercede had made six joint payments totaling $1,323,000.

Dominion filed for bankruptcy in September, 1998. Shortly thereafter, PSE sent a letter to Mercede, stating that Dominion still owed PSE more than $600,000, and demanding that Mercede immediately pay this "undisputed" amount, "plus interest, and excluding other claims for delays, etc. that will be coming shortly." Mercede refused to make any further payments without confirmation from Dominion as to the validity of PSE's claim.

On October 13, 1998, PSE formally notified National of its claim for $1,123,551 against the payment bond. National thereafter assigned the claim to Laurence P. Jortner, surety claims analyst for National's parent corporation, CNA Surety. On November 2, 1998, Jortner sent a letter to PSE, in response to the claim, communicating National's position that "a number of bona fide or otherwise unresolved disputes exist between your company and either [Mercede] or Dominion," and that much of PSE's claim was "likely to be subject to reasonable defenses by [Mercede] or [National]." Jortner also requested that PSE submit further documentation in support of its claim. PSE complied with this request shortly thereafter.

National took no further action until February, 1999, when Jortner met with several representatives of Mercede to discuss defenses to the claim. At this meeting, Mercede's representatives told Jortner that they were disputing the claim in its entirety, including PSE's claims for payment for extra work and for the $150,000 retainage.

Additionally, in February, 1999, Jortner was contacted by Robert Dunn, counsel for PSE. On February 13, Dunn sent a letter to Jortner, and a copy of that letter to the insurance commissioner, claiming that

National had breached its obligations under paragraph six of the payment bond to pay undisputed amounts and to explain the basis for any disputed amounts within forty-five days of the receipt of a claim.[4] Jortner immediately responded that National was conducting a detailed investigation, and that, "[a]s of now, [PSE's] claim is fully disputed by [Mercede] and [National] believes that [Mercede] has provided it with, at [a] minimum, bona fide legal defenses regarding [PSE's] claim." PSE subsequently filed a formal complaint with the insurance commissioner.

Soon thereafter, National shifted its position on the PSE claim. In May, 1999, Jortner again met with representatives of Mercede. This time, Jortner suggested that either National or Mercede make a payment to PSE in the amount of $177,000—representing the $150,000 retainage plus a $27,000 balance remaining on the original contract. Mercede agreed to pay the $27,000 remaining balance, but maintained that it would not pay the $150,000 retainage because the project owner had not yet paid that amount to Mercede. Mercede continued to dispute PSE's claims for payment for extra work.

In August, 1999, PSE filed the original complaint in the underlying action against Mercede and National, seeking damages from Mercede for breach of contract, and claiming that National had acted in bad faith and had committed violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-

---

[4] The payment bond sets forth the procedures by which a claimant may make a claim against the bond. Once a claimant has complied with those procedures, paragraph six of the payment bond provides that "the Surety shall promptly and at the Surety's expense take the following actions:

"6.1 Send an answer to the Claimant, with a copy to the Owner, within 45 days after receipt of the claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed.

"6.2 Pay or arrange for payment of any undisputed amounts."

110a et seq. Unbeknownst to Mercede, National's counsel contacted PSE's counsel to discuss the possibility of a settlement of PSE's bad faith and CUTPA claims against National. National and PSE, however, did not reach an agreement at that time.

In September, 2000, almost two years after PSE initially had filed its formal notice of a claim against the payment bond, National conducted its independent investigation of the claim. At that time, Jortner enlisted Raymond Lemming, National's in-house chief engineer, to evaluate the fair market value of PSE's work on the project. Lemming concluded that PSE's work had a fair market value of approximately $927,913. That value was based, however, on PSE's work under the base contract and did not include PSE's claimed extra work.

Thereafter, National persistently attempted to settle PSE's claims. In April, 2001, Jortner attended a settlement meeting with counsel for National and counsel for PSE. No representatives of Mercede were present at this meeting. In October, 2001, National made a payment to PSE in the amount of $200,000. According to Jortner, this payment represented the $150,000 retainage plus an additional $50,000, constituting three years of interest at 10 percent. The payment was made at the time of Jortner's deposition, and Mercede, who had no prior knowledge of the settlement negotiations, objected to the payment.

On October 31, 2001, Jortner wrote a letter to Mercede, demanding that Mercede reimburse National for the $200,000 payment and either comply with the settlement of the remainder of PSE's claims, or deposit collateral of $500,000 with National, in accordance with National's rights under the indemnity agreement. Mercede refused to comply with either of these demands.

On November 30, 2001, National made a payment of $500,000 to PSE. On December 6, 2001, PSE released

its claims against National, leaving Mercede as the lone defendant to the action brought by PSE. Mercede and PSE reached a settlement on the first day of trial. As a result, the trial was limited to resolution of National's cross complaint, which sought indemnification from Mercede, and Mercede's counter cross complaint, which sought damages arising from a breach of contract and breach of the implied covenant of good faith and fair dealing. After a trial that lasted approximately two weeks, the jury returned a verdict for Mercede on both National's cross complaint and Mercede's counter cross complaint. Specifically, in the interrogatories submitted to the jury by the trial court, the jury stated its finding that National had not proven, by a preponderance of the evidence, "all five elements" of its claim for indemnification. Additionally, the jury found that Mercede had proven its special defense that National had breached the implied covenant of good faith and fair dealing, as well as the special defenses of estoppel and waiver.[5] Concerning Mercede's counter cross complaint, the jury found that National had not breached the indemnity agreement. Nonetheless, the jury also found that National had breached the implied covenant of good faith and fair dealing, and it awarded Mercede nominal damages. The trial court rendered judgment for Mercede in accordance with the jury's verdicts. This appeal followed. Additional facts will be set forth as necessary.

I

We first address National's claim that the trial court improperly instructed the jury that National had the burden of proving the propriety of its payments to PSE. Specifically, National contends that, in so instructing the jury, the trial court disregarded the express terms

[5] The jury also found that Mercede had not proven its special defenses that National had breached the indemnity agreement and had failed to mitigate its damages.

of the indemnity agreement, which provided that any evidence of a payment by National to a claimant upon the bond is "prima facie evidence" of the propriety of that payment. According to National, the trial court should have instructed the jury that, upon a finding that National, as the surety, had made a payment to PSE, the claimant, upon the payment bond, the prima facie evidence provision of the indemnity agreement shifted the burden of proof to Mercede, the principal, and its indemnitors[6] to prove that National's payment was improper. We agree. We also conclude, however, that this instructional impropriety constituted harmless error.

National takes issue with the following portion of the trial court's jury instruction: "The five elements of National's indemnity claim are: (1) Was the [indemnity agreement] in existence and signed by Mercede and National? (2) Did PSE submit a claim under the payment bond . . . ? (3) Was the . . . payment bond in existence and signed by the proper parties? (4) Did National pay to PSE $700,000? (5) Was the $700,000 payment to PSE as a result of PSE's claim and lawsuit against the payment bond . . . ?" The trial court further charged the jury "that elements one, two, three and four have been proven either by the evidence or the admissions of the parties. National has the burden by the preponderance of the evidence to prove element five."

"Our analysis begins with a well established standard of review. When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test

---

[6] The indemnity agreement refers to Mercede and its individual indemnitors, respectively, as "the Principal" and "the Indemnitors." For simplicity's sake, in our quoting of the indemnity agreement, we shall refer collectively to Mercede and its indemnitors as "Mercede."

of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . We do not critically dissect a jury instruction." (Internal quotation marks omitted.) *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 238–39, 828 A.2d 64 (2003).

National contends that this jury instruction was improper because it disregarded the express terms of the indemnity agreement. Because the indemnity agreement is a written contract, our analysis of this issue must be guided by our well established principles of contract interpretation. Under these principles, "[a] contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. . . . Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." (Citations omitted; internal quotation marks omitted.) *Poole* v. *Waterbury*, 266 Conn. 68, 87–88, 831 A.2d 211 (2003). Neither National nor Mercede contends that the terms of the indemnity

agreement are ambiguous. Accordingly, our review of this issue is plenary.

National, relying on paragraphs two and five of the indemnity agreement, asserts that Mercede had agreed "to waive certain rights and benefits in exchange for National's issuance of . . . bonds on [Mercede's] behalf." Paragraph two of the indemnity agreement provided in relevant part: "[Mercede] will indemnify and save [National] harmless from and against every claim, demand, liability, cost, charge, suit, judgment and expense which [National] may pay or incur in consequence of having executed, or procured the execution of such bonds, or any renewals or continuations thereof or substitutes therefor, including, but not limited, to fees of attorneys, whether on salary, retainer or otherwise, and the expense of procuring, or attempting to procure, release from liability, or in bringing suit to enforce the obligation of . . . [Mercede] under this Agreement." In addition, paragraph two contained the following "prima facie evidence" provision: "In the event of payments by [National], [Mercede] agree[s] to accept the voucher or other evidence of such payments as *prima facie evidence of the propriety thereof, and of [Mercede's] liability therefor to [National]*." (Emphasis added.) Paragraph five of the indemnity agreement is a "right-to-settle" provision: "[National] shall have the exclusive right to determine for itself and [Mercede] whether any claim or suit brought against [National] or [Mercede] upon any such bond shall be settled or defended and its decision shall be binding and conclusive upon [Mercede]."

The terms set forth by paragraphs two and five are typical of indemnity agreements utilized throughout the surety industry, and courts routinely have upheld the validity of similar or identical provisions. See, e.g., *Transamerica Ins. Co.* v. *Bloomfield*, 401 F.2d 357, 362 (6th Cir. 1968) ("[p]rovisions in indemnity agreements

granting to the indemnitor the right to compromise and settle claims, and providing that vouchers and other evidence of payment shall be prima facie evidence of the propriety thereof, have been upheld as not against public policy and enforced by the courts"); *Engbrock v. Federal Ins. Co.*, 370 F.2d 784, 786 (5th Cir. 1967) (provisions wherein "voucher or other evidence of payment by said [surety] . . . shall be prima facie evidence . . . of each [i]ndemnitor's liability to said [surety]" and decisions of surety were "final and *conclusive and unconditionally* binding upon each [i]ndemnitor" upheld as not against public policy [emphasis in original]); *United States Fidelity & Guaranty Co. v. Napier Electric & Construction Co.*, 571 S.W.2d 644, 645–46 (Ky. App. 1978) (same); *Associated Indemnity Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 281, 283 and n.5 (Tex. 1998) (principal terms of indemnity agreement, vesting surety with "exclusive right" to settle claims in good faith and providing that "vouchers for . . . payments, shall be prima facie evidence" of indemnitors' liability to surety, are "standard throughout the industry, and have been widely upheld by courts"); see also J. Hinchey, "Surety's Performance Over Protest of Principal: Considerations and Risks," 22 Tort & Ins. L.J. 133, 146–47 (1986) (discussing enforceability of right-to-settle and prima facie evidence clauses).

Right-to-settle clauses, such as paragraph five of the indemnity agreement in this case, generally are enforced according to their terms. In other words, in the face of such a provision, a surety typically has wide discretion in settling claims made upon a bond, even where the principal is not liable for the underlying claim. See, e.g., *United States Fidelity & Guaranty Co. v. Napier Electric & Construction Co.*, supra, 571 S.W.2d 646; *Fidelity & Deposit Co. of Maryland v. Fleischer*, 772 S.W.2d 809, 816 (Mo. App. 1989); *Hess*

v. *American States Ins. Co.*, 589 S.W.2d 548, 551 (Tex. App. 1979); see also J. Hinchey, supra, 22 Tort & Ins. L.J. 146. The surety's discretion to make settlement payments is not unfettered, however, and most jurisdictions have held that the surety is entitled to indemnification only for payments that were made in good faith. See part II of this opinion.

The prima facie evidence provision in paragraph two of the indemnity agreement at issue here brings that limitation into focus. Courts interpreting similar or identical provisions routinely have concluded that, upon a finding that a surety has made a payment to a claimant upon a bond, the burden of proof shifts to the indemnitor to prove that the surety had not made the payment in good faith. See, e.g., *Transamerica Ins. Co.* v. *Bloomfield*, supra, 401 F.2d 362–63; *Engbrock* v. *Federal Ins. Co.*, supra, 370 F.2d 786 (where indemnity agreement has prima facie evidence provision, indemnitor may avoid liability "only by pleading and proving fraud or lack of good faith by [s]urety"); *United States Fidelity & Guaranty Co.* v. *Napier Electric & Construction Co.*, supra, 571 S.W.2d 646 (same). "The purpose of [prima facie evidence] clauses . . . is to facilitate the handling of settlements by sureties and obviate unnecessary and costly litigation." *Transamerica Ins. Co.* v. *Bloomfield*, supra, 363.

Although the prima facie evidence provision frequently is invoked to enable a surety to prevail on a motion for summary judgment; see, e.g., *United States Fidelity & Guaranty Co.* v. *Feibus*, 15 F. Sup. 2d 579, 582–83 (M.D. Pa. 1998); courts explicitly and implicitly have construed these provisions as shifting the burden of proof at trial. See, e.g., *Ideal Electronic Security Co.* v. *International Fidelity Ins. Co.*, 129 F.3d 143, 151 (D.C. Cir. 1997) (at trial in which surety sought indemnification for attorney's fees, prima facie evidence provision shifted burden to indemnitor to prove fees were

excessive); *Transamerica Ins. Co.* v. *Bloomfield,* supra, 401 F.2d 362–63 (uncontroverted evidence at trial demonstrated that surety had performed in good faith; therefore, prima facie evidence provision required verdict for surety); *Engbrock* v. *Federal Ins. Co.,* supra, 370 F.2d 786 (under prima facie evidence provision, indemnitor must plead *and prove* bad faith on part of surety); *United States Fidelity & Guaranty Co.* v. *Napier Electric & Construction Co.,* supra, 571 S.W.2d 646 (same); *Hess* v. *American States Ins. Co.,* supra, 589 S.W.2d 551 (same); *Fidelity & Deposit Co. of Maryland* v. *Wu,* 150 Vt. 225, 228–29, 552 A.2d 1196 (1988) (indemnitor had burden of producing evidence concerning surety's bad faith, regardless of whether prima facie evidence provision gave rise to presumption of good faith); see also *Hawaiian Ins. & Guaranty Co., Ltd.* v. *Higashi,* 67 Haw. 12, 14, 675 P.2d 767 (1984) ("[o]bviously, where such a provision is in the agreement, the burden of proof on those issues shifts").

We note that there is an apparent disagreement as to whether such provisions shift to the party who is contesting the surety's claim for indemnification both the burdens of production and persuasion, or merely the burden of production. Compare *Engbrock* v. *Federal Ins. Co.,* supra, 370 F.2d 786 (stating that indemnitor must plead *and prove* surety's bad faith) and *United States Fidelity & Guaranty Co.* v. *Napier Electric & Construction Co.,* supra, 571 S.W.2d 646 (same) with *Associated Indemnity Corp.* v. *CAT Contracting, Inc.,* supra, 964 S.W.2d 283 n.5 (prima facie evidence provision shifts burden of production only) and *Fidelity & Deposit Co. of Maryland* v. *Wu,* supra, 150 Vt. 229 n.3 (same); see generally *Potter* v. *Chicago Pneumatic Tool Co.,* 241 Conn. 199, 235–36 n.26, 694 A.2d 1319 (1997). We need not determine, in the present case, the scale of the prima facie evidence provision in paragraph two

of the indemnity agreement because any impropriety caused by the trial court's instruction was harmless.

"An improper instruction on the burden of proof may so mislead the jury as to be potentially harmful to one of the parties and therefore may amount to reversible error." (Internal quotation marks omitted.) *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 241. Nonetheless, "[i]t is axiomatic . . . that not every error is harmful. . . . [W]e have often stated that before a party is entitled to a new trial . . . he or she has the burden of demonstrating that the error was harmful. . . . An instructional impropriety is harmful if it is likely that it affected the verdict." (Internal quotation marks omitted.) *Schoonmaker* v. *Lawrence Brunoli, Inc.*, supra, 265 Conn. 243; *Scanlon* v. *Connecticut Light & Power Co.*, 258 Conn. 436, 448, 782 A.2d 87 (2001); accord *Godwin* v. *Danbury Eye Physicians & Surgeons, P.C.*, 254 Conn. 131, 145, 757 A.2d 516 (2000); *Remington* v. *Aetna Casualty & Surety Co.*, 240 Conn. 309, 316, 692 A.2d 399 (1997).

At trial, Mercede asserted, as a special defense, that National had breached the implied covenant of good faith and fair dealing. The trial court properly instructed the jury that Mercede bore the burden of proving this special defense; see part III of this opinion; and the jury subsequently found that Mercede had met that burden. Therefore, because Mercede proved to the jury that National had breached the covenant of good faith and fair dealing, and had therefore performed in bad faith, it is not likely that the jury's verdict would have been different had the trial court properly instructed the jury that the prima facie evidence clause shifted the burden to Mercede to prove bad faith. Accordingly, we conclude that any error caused by this instruction was harmless.

## II

We turn next to National's claim that the trial court improperly denied its motion for a directed verdict on its claim for indemnification. Specifically, National contends that the jury improperly concluded that the $200,000 and $500,000 payments to PSE had not been made in satisfaction of PSE's claim under the payment bond. As we previously have discussed, under the terms of the indemnity agreement in this case, National's payments to PSE presumptively were proper unless Mercede could prove its special defense—that National had made those payments in bad faith.[7] See part I of this opinion. Because the jury, having been instructed properly; see part III of this opinion; reasonably could have concluded, on the basis of the evidence and the logical inferences drawn therefrom, that National had acted in bad faith, we determine that the trial court did not improperly deny National's motion for a directed verdict.

At the close of trial, National moved for a directed verdict.[8] National claimed that Mercede's counterclaim and numerous special defenses had not been proven. At the heart of National's various arguments before the trial court in support of its motion for a directed verdict was its contention that the indemnity agreement gave National full discretion to make the payments to PSE, and that its exercise of that discretion did not constitute bad faith. Mercede responded in detail identifying those actions and omissions by National that supported a finding of bad faith—principally, National's failure to

---

[7] This court has tended to use the terms "bad faith," "lack of good faith" and "breach of the covenant of good faith and fair dealing" interchangeably. See, e.g., *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 564, 733 A.2d 197 (1999); *Multi-Service Contractors, Inc.* v. *Vernon*, 193 Conn. 446, 452, 477 A.2d 653 (1984). We maintain that practice in this opinion.

[8] At the close of National's case, Mercede had moved for a directed verdict, and the trial court reserved its decision on that motion.

conduct an investigation concerning the validity of PSE's claim against the payment bond and its self-interested settlement of the issue. The trial court reserved its decision on the motion.

Thereafter, on April 3, 2002, after the jury returned its verdict, National simultaneously filed a motion to set aside the verdict, a motion for a new trial and a renewed motion for a directed verdict.[9] National argued, inter alia, that the jury's finding that the $700,000 paid to PSE was not a result of the payment bond was contrary to the law and the evidence, and that National's exercise of its contractual rights did not constitute bad faith. In its response to the motions, Mercede argued, inter alia, that the issue regarding National's payment to PSE was essentially a question of whether National had acted in good faith and that there was sufficient evidence before the jury from which it could find bad faith. The trial court denied National's motions, in part, because, on the basis of the evidence presented, the jury reasonably could have found that National had made payments to PSE to settle PSE's bad faith and CUTPA claims rather than its claims against the payment bond. On appeal, National revives its arguments on this issue[10] and

[9] Concurrently, Mercede filed a motion to set aside part of the verdict and a motion for additional relief to enforce the settlement agreement. The trial court's resolution of these matters is not at issue in this appeal.

[10] Although National presents this issue as one concerning allocation, that is, that the jury failed to allocate properly how much of the $700,000 in payments to PSE had been made in response to a proper claim on the payment bond and how much had been to settle PSE's bad faith and CUTPA claims, we view this claim in a broader context. The dispositive issue on appeal is whether the jury reasonably could have found that National had made the payments in bad faith. This approach is not inconsistent with the interrogatories that presented the issue to the jury, and we note that, during argument before the trial court concerning the motions, the parties recognized that this issue potentially involved an "all or nothing" approach. The jury could have found that the payments were proper in their entirety, or that neither of the payments was proper, or they could have chosen to allocate the payments and find that *some* of the payments were proper. As

maintains that the trial court improperly failed to direct a verdict in its favor.[11]

Specifically, National claims that, under the indemnity agreement, it had the exclusive right to settle and defend claims, and that its determination to settle with PSE was conclusive as to Mercede. National argues that, because it offered evidence at trial that it had determined that some of PSE's claims on the payment bond were valid, and that it had valued those claims at $500,000, the jury failed to allocate properly by failing to find that *any* of the money paid to PSE constituted proper payment. Therefore, National contends, the jury reasonably could not have concluded from the evidence presented that it had performed in bad faith when it merely was exercising its contractual rights under the indemnity agreement. National further contends that its business judgment in this matter should not be questioned or second-guessed by a jury.

Mercede, in response, argues that the jury, properly instructed that Mercede had the burden of proof as to its special defense of bad faith, reasonably could have determined from the evidence that National had made the payments to PSE because of National's failure to

---

stated earlier, on the basis of its determination of bad faith, the jury concluded that neither of the payments was proper.

[11] On appeal, National also argues that, "as a matter of justice and equity," the verdict must be set aside because Mercede has kept the $150,000 retainage paid by the owner. In addition to being inadequately briefed; see *Commissioner of Social Services* v. *Smith*, 265 Conn. 723, 732–33 n.11, 830 A.2d 228 (2003) (court not required to review issues inadequately briefed); our review of the record indicates that this argument was not raised in either National's motion for a directed verdict, motion to set aside the verdict, motion for a new trial, or renewed motion for a directed verdict. "Proper preservation of claims for appellate review requires that the trial court [be] effectively . . . alerted to a claim of potential error while there [is] still time for the court to act." (Internal quotation marks omitted.) *United Technologies Corp.* v. *East Windsor*, 262 Conn. 11, 31, 807 A.2d 955 (2002). Because the plaintiff failed properly to preserve this claim, we decline to review it.

perform under the payment bond, and not because PSE legitimately was owed any money. Mercede claims that the evidence supports the jury's finding that National had acted in bad faith in its settlement of PSE's claim for the purpose of releasing itself from PSE's bad faith and CUTPA claims, as well as avoiding an investigation by the insurance commissioner, and in its failure to conduct a proper investigation of the claim upon the payment bond. We agree with Mercede that, on the basis of the evidence presented to the jury, the trial court's decision to deny National's motion for a directed verdict was not improper.

We begin with a brief discussion of the standard by which we review this claim. It is well established that "[o]ur review of a trial court's refusal to direct a verdict or to render judgment notwithstanding the verdict takes place within carefully defined parameters. We must consider the evidence, including reasonable inferences which may be drawn therefrom, in the light most favorable to the parties who were successful at trial; *Bleich v. Ortiz*, 196 Conn. 498, 501, 493 A.2d 236 (1985); giving particular weight to the concurrence of the judgments of the judge and the jury, who saw the witnesses and heard the testimony . . . . The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached their conclusion." (Internal quotation marks omitted.) *Cohen v. Yale-New Haven Hospital*, 260 Conn. 747, 761, 800 A.2d 499 (2002).

Under paragraph two of the indemnity agreement in this case, Mercede expressly agreed to indemnify National for every "cost . . . and expense which [National] may pay or incur in consequence of having executed . . . bonds . . . ." Moreover, Mercede agreed, pursuant to paragraph five of the indemnity agreement, that "[National] shall have the exclusive right to determine for itself and [Mercede] whether any

claim or suit brought against [National] or [Mercede] upon any such bond shall be settled or defended and its decision shall be binding and conclusive upon [Mercede]." On the basis of the indemnity agreement, National argues that it had broad discretion to settle claims upon the payment bond, even over the objection of the principal, Mercede. We agree that indemnity agreements, such as the one here, typically guarantee the surety wide discretion in settling claims made upon a payment bond. This discretion is, however, not unfettered.

Other jurisdictions faced with this issue uniformly have held that the surety is entitled to indemnification only for payments that were made in good faith. See, e.g., *Gundle Lining Construction Corp.* v. *Adams County Asphalt, Inc.*, 85 F.3d 201, 210–11 (5th Cir. 1996); *Fidelity & Deposit Co. of Maryland* v. *Bristol Steel & Iron Works, Inc.*, 722 F.2d 1160, 1162–63 (4th Cir. 1983); *Transamerica Ins. Co.* v. *Bloomfield,* supra, 401 F.2d 362; *Engbrock* v. *Federal Ins. Co.*, supra, 370 F.2d 786; *Carroll* v. *National Surety Co.*, 24 F.2d 268, 270–71 (D.C. Cir. 1928); *United States Fidelity & Guaranty Co.* v. *Feibus*, supra, 15 F. Sup. 2d 583–85; *National Surety Corp.* v. *Peoples Milling Co.*, 57 F. Sup. 281, 282–83 (W.D. Ky. 1944); *Martin* v. *Lyons*, 98 Idaho 102, 105–106, 558 P.2d 1063 (1977); *United States Fidelity & Guaranty Co.* v. *Klein Corp.*, 190 Ill. App. 3d 250, 255, 558 N.E.2d 1047 (1989); *The Hartford* v. *Tanner*, 22 Kan. App. 2d 64, 70, 910 P.2d 872, review denied, 259 Kan. 927 (1996); *United States Fidelity & Guaranty Co.* v. *Napier Electric & Construction Co.*, supra, 571 S.W.2d 646; *International Fidelity Ins. Co.* v. *Spadafina*, 192 App. Div. 2d 637, 639, 596 N.Y.S.2d 453 (1993); *Portland* v. *George D. Ward & Associates, Inc.*, 89 Or. App. 452, 456–57, 750 P.2d 171, review denied, 305 Or. 672, 757 P.2d 422 (1988); *Hess* v. *American States Ins. Co.*, supra, 589 S.W.2d 550; *Fidelity & Deposit Co. of*

*Maryland* v. *Wu*, supra, 150 Vt. 230; but see *Fireman's Ins. Co. of Newark, New Jersey* v. *Todesca Equipment Co.*, 310 F.3d 32, 37 (1st Cir. 2002) (common-law covenant inapplicable given stringent language of indemnity agreement). Although some jurisdictions have limited the surety's duty of good faith to cases wherein the indemnity agreement has expressly imposed that duty upon the surety; see *Associated Indemnity Corp.* v. *CAT Contracting, Inc.*, supra, 964 S.W.2d 278 (surety has no common-law duty of good faith under Texas law, but there was evidence to support finding that surety failed to satisfy contractual condition of good faith in indemnity agreement); courts in jurisdictions that recognize the existence of an implied covenant of good faith and fair dealing in every contract have concluded that a surety owes a duty of good faith to its principal irrespective of whether the indemnity agreement expressly imposes that duty. See, e.g., *The Hartford* v. *Tanner*, supra, 71 ("obligation of good faith and fair dealing on the part of the surety is implied and in a sense superimposed on the entire surety contract"); *Portland* v. *George D. Ward & Associates, Inc.*, supra, 456–57 (applying "implied obligation of good faith in . . . every contract" to indemnity agreement); see also *Associated Indemnity Corp.* v. *CAT Contracting, Inc.*, supra, 282 ("[t]hose jurisdictions recognizing an affirmative duty of good faith in surety contracts have generally done so . . . because they impose such duty in all contracts").

Although the indemnity agreement at issue in the present case did not require, expressly, that National act in good faith, the parties recognized, both at trial and at oral argument before this court, that the implied covenant of good faith is an overlay that applies to sureties. *Arntz Contracting Co.* v. *St. Paul Fire & Marine Ins. Co.*, 47 Cal. App. 4th 464, 482, 54 Cal. Rptr. 2d 888 (1996) (standard of good faith implied in every

contract to surety conduct; doctrine has "particular application in situations where one party is invested with a discretionary power affecting the rights of another"); see also *Portland* v. *George D. Ward & Associates, Inc.*, supra, 89 Or. App. 457–58 (applying reasonableness standard to bad faith where indemnity agreement subjects right to compromise claim to surety's sole discretion). This application of the implied covenant of good faith and fair dealing to surety indemnity agreements is consistent with our good faith jurisprudence. See *Home Ins. Co.* v. *Aetna Life & Casualty Co.*, 235 Conn. 185, 200, 663 A.2d 1001 (1995) ("[e]very contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement" [internal quotation marks omitted]); *Habetz* v. *Condon*, 224 Conn. 231, 238, 618 A.2d 501 (1992) (same); *Verrastro* v. *Middlesex Ins. Co.*, 207 Conn. 179, 190, 540 A.2d 693 (1988) ("[t]he concept of good faith and fair dealing is [e]ssentially . . . a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended" [internal quotation marks omitted]). To decide the present issue, we find it necessary, however, to look outside our jurisdiction to seek guidance on how the covenant of good faith applies specifically in the surety context.

A

We note that the approach taken by our sister states is not uniform. "Though the weight of authority seems to be on the side of recognizing a duty of good faith, there is no consensus about what that duty requires." T. Harris, "Good Faith, Suretyship, and the Ius Commune," 53 Mercer L. Rev. 581, 587 (2002). The majority

of courts agree[12] that the principal must establish something more than mere negligence to prove bad faith. See, e.g., *Engbrock* v. *Federal Ins. Co.*, supra, 370 F.2d 787 ("neither lack of diligence nor negligence is the equivalent of bad faith"); *Frontier Ins. Co.* v. *International, Inc.*, 124 F. Sup. 2d 1211, 1214 (N.D. Ala. 2000) (same); *United States Fidelity & Guaranty Co.* v. *Feibus*, supra, 15 F. Sup. 2d 587 ("[g]ross negligence or bad judgment is insufficient to amount to bad faith"); *Employers Ins. Of Wausau* v. *Able Green, Inc.*, 749 F. Sup. 1100, 1103 (S.D. Fla. 1990) (surety's actions may have been negligent but did not rise to level of deliberate malfeasance required to establish bad faith); *American Employers' Ins. Co.* v. *Horton*, 35 Mass. App. 921, 924, 622 N.E.2d 283 (1993) ("bad judgment, negligence or insufficient zeal" not evidence of bad faith); *Fidelity & Deposit Co. of Maryland* v. *Wu*, supra, 150 Vt. 231 ("[a]t best, the jury could draw the conclusion that [the] plaintiff was negligent . . . there was no evidence of lack of good faith for the jury").[13] Unfortunately, many of

---

[12] We note that a minority of jurisdictions have appraised surety conduct under a less forgiving standard, namely, one that defines bad faith as conduct that was unreasonable or negligent. See, e.g., *Rush Presbyterian St. Luke's Medical Center* v. *Safeco Ins. Co. of America*, 712 F. Sup. 1344, 1346 (N.D. Ill. 1989) ("negligence and bad faith are synonymous" in context of determining good faith); *Arntz Contracting Co.* v. *St. Paul Fire & Marine Ins. Co.*, supra, 47 Cal. App. 4th 483 (surety's bad faith can be demonstrated by proof of "objectively unreasonable conduct, regardless of the actor's motive" [internal quotation marks omitted]); *Hawaiian Ins. & Guaranty Co., Ltd.* v. *Higashi*, supra, 67 Haw. 14 ("burden of establishing that the amount paid in the settlement . . . was reasonable and in good faith [is] upon the indemnitee"); *The Hartford* v. *Tanner*, supra, 22 Kan. App. 2d 76 ("good faith requires a surety seeking indemnification to show that its conduct was reasonable"); *Portland* v. *George D. Ward & Associates, Inc.*, supra, 89 Or. App. 458 (to prove bad faith in settling claim, indemnitors "needed only to prove that [the surety] failed to make a reasonable investigation of the validity of the claims against them or to consider reasonably the viability of their counterclaims and defenses, not that [the surety] acted for dishonest purposes or improper motives"); see also E. Gallagher, The Law of Suretyship (2d Ed. 2000) pp. 492–95 (discussing cases).

[13] Some courts appear to go so far as to require actual fraud in order for the surety's actions to rise to the level of bad faith. See, e.g., *Fireman's*

these jurisdictions do not go past this label to define the term "bad faith." In those jurisdictions that do further define the term, one common characterization used frequently, is that bad faith, in essence, means that the surety acted with an "improper motive" or "dishonest purpose." See, e.g., *Engbrock* v. *Federal Ins. Co.*, supra, 787 (improper motive); *Travelers Casualty & Surety Co. of America, Inc.* v. *Jadum Construction Co.*, United States District Court, 2003 U.S. Dist. LEXIS 11861, *5 (July 11, 2003) (dishonest purpose); *Fidelity & Guaranty Ins. Co.* v. *Keystone Contractors, Inc.*, United States District Court, Docket No. 02CV1328, 2002 U.S. Dist. LEXIS 15403, *13 (E.D. Pa. August 14, 2002) (dishonest purpose); *Frontier Ins. Co.* v. *International, Inc.*, supra, 1214 (improper motive; dishonest purpose); *United States Fidelity & Guaranty Co.* v. *Feibus*, supra, 587 (improper motive; dishonest purpose); *Safeco Ins. Co. of America* v. *Criterion Investment Corp.*, 732 F. Sup. 834, 841 (E.D. Tenn. 1989) (improper motive); *Associated Indemnity Corp.* v. *CAT Contracting, Inc.*, supra, 964 S.W.2d 285, 289 (improper motive; dishonest purpose); *Ford* v. *Aetna Ins. Co.*, 394 S.W.2d 693, 698 (Tex. App. 1965) (improper motive).

After full consideration of the issue before us, we join those jurisdictions that define bad faith as requiring an "improper motive" or "dishonest purpose" on the

*Ins. Co. of Newark, New Jersey* v. *Todesca Equipment Co.*, supra, 310 F.3d 37 (bad faith requires fraud or collusion under Rhode Island law); *General Accident Ins. Co. of America* v. *Merritt-Meridian Construction Corp.*, 975 F. Sup. 511, 516 (S.D.N.Y. 1997) (indemnity agreement's right-to-settle clause is invoked "[i]n the absence of an indication of fraud or collusion"); *Banque Nationale de Paris S.A.* v. *Ins. Co. of North America*, 896 F. Sup. 163, 165 (S.D.N.Y. 1995) (analogizing to business judgment rule and ruling that absent self-interest or fraud, surety's decision should be regarded as presumptively correct); *Reliance Ins. Co.* v. *Romine*, 707 F. Sup. 550, 552 (S.D. Ga. 1989) (bad faith equated with arbitrary or capricious standard for proving abuse of discretion), aff'd, 888 F.2d 1344 (11th Cir. 1989); *Hess* v. *American States Ins. Co.*, supra, 589 S.W.2d 551 (indemnity agreement "lodged in the indemnitee a discretion limited only by the bounds of fraud").

part of the surety. This standard is in substantial accord with our definition of bad faith in other contexts. See *Buckman* v. *People Express, Inc.*, 205 Conn. 166, 171, 530 A.2d 596 (1987) (jury instruction that "bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . it contemplates a state of mind affirmatively operating with furtive design or ill will" [internal quotation marks omitted]). Additionally, this standard preserves a proper balance between affording the surety the wide discretion to settle that it requires, while ensuring that the principal is protected against serious and wilful transgression.

We are careful to note, however, that we do not interpret this standard as requiring the improper motive to rise to the level of fraud. See footnote 13 of this opinion. To do so would virtually obliterate the prophylactic effect of the covenant of good faith and fair dealing. See *The Hartford* v. *Tanner*, supra, 22 Kan. App. 2d 77 ("[a]llowing the surety's indemnification contract to be enforced, absent fraud, leaves the principal and indemnitor at the mercy of the surety's unreasonable conduct"). We further note, that, although we are not interpreting good faith to mean reasonableness; see footnote 12 of this opinion; whether a surety's actions were reasonable properly may be considered when analyzing bad faith. Unreasonable conduct can be evidence of improper motive and is a proper consideration where parties are bound by a contract that gives unmitigated discretion to one party. Applying these principles, we evaluate the evidence from which the jury reasonably could have concluded that Mercede was not bound to indemnify National's payments to PSE because they had been made in bad faith.

1

The evidence from which the jury reasonably could have concluded that National had acted in bad faith includes National's failure to conduct a sufficient investigation. Paragraph 6.1 of the payment bond directed National to send an answer to PSE within forty-five days after receiving formal notice of PSE's claim against the bond. In its response, National was obligated to identify what part of the claim it had determined to be undisputed, as well as to provide the basis for challenging any disputed amounts. Mercede presented evidence that National improperly had failed to put into writing, as required by the payment bond, its opinion as to whether all or any part of PSE's claim was disputed. Therefore, the parties involved, including Mercede, were not notified as to what portion of PSE's claims National considered to be undisputed and what evidence it had in support of that assessment. Moreover, paragraph 6.2 of the payment bond directed National to pay only claims upon the payment bond that were undisputed. From these facts, the jury reasonably could have found that National was obligated to investigate PSE's claims in a manner sufficient to determine whether the amount claimed by PSE was in dispute.

Additionally, Mercede presented evidence from which the jury could have concluded that Jortner had engaged in only a superficial review of PSE's claim; in particular, he personally never had reviewed Mercede's project records. Mercede presented evidence that Jortner was not himself capable of making an adequate assessment of the claim because he lacked the knowledge and experience necessary to do so. Mercede further presented evidence that, in September, 2000, almost two years after National was obligated under the payment bond to respond to PSE's claims, Jortner requested that Lemming, National's in-house engineer, evaluate the claims. Lemming advised Jortner that the

reasonable value of all work performed by PSE was $927,913, but by that point, Mercede already had paid PSE more than $1.3 million. Despite Lemming's valuation, Jortner made payments to PSE in October and November, 2001, in the amounts of $200,000 and $500,000, respectively.

First, National argues that there is no legal standard by which it had to investigate PSE's claim. Next, National claims that, from the evidence presented, the jury should have found that National ultimately had fulfilled its notification obligations under the payment bond, as evidenced by Jortner's letters of November 2, 1998, and February 15, 1999. National further claims that it presented evidence that Jortner adequately had considered the information regarding the claim, and that it was reasonable for him to have believed that PSE would have a significant recovery against the payment bond at a trial of the case. It argues that Mercede's attack on Jortner's competency in evaluating whether the claim under the payment bond should have been paid is disparaging and, ultimately, irrelevant, as the proper legal issue is whether Jortner acted with malice toward Mercede. National also points out that Lemming's estimate, valuing PSE's work at just below $1 million, did not take into account PSE's claims for extra work, and other costs. Therefore, National argues, because Mercede did not present evidence to the jury that Lemming actually had considered PSE's additional claims as part of his estimate, the jury could not have concluded that the value of PSE's claims did not exceed $1 million.

"Central to the factfinding process is the process of drawing inferences, and central to the process of drawing inferences is the notion that the factfinder is not required to draw only those inferences consistent with one view of the evidence, but may draw whatever inferences from the evidence or facts established by

the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *In re Keijam T.*, 221 Conn. 109, 123, 602 A.2d 967 (1992). Therefore, even if we were to assume, as we must, that the jury rejected National's account, finding these issues of fact entirely in Mercede's favor, we conclude that the jury reasonably and legally could have concluded that, despite its obligation to conduct a proper investigation, National failed to do so.

Whether that finding leads inexorably to the ultimate determination of bad faith is an issue that has been addressed in other jurisdictions. Our reading of this authority informs us that the surety is under an obligation to conduct a proper investigation. See, e.g., *Continental Casualty Co.* v. *American Security Corp.*, 443 F.2d 649, 650 (D.C. Cir. 1970) (upholding summary judgment for surety where uncontradicted affidavits stated that all claims had been paid by surety "in good faith after investigation"), cert. denied, 402 U.S. 907, 91 S. Ct. 1378, 28 L. Ed. 2d 647 (1971); *Banque Nationale de Paris S.A.* v. *Ins. Co. of North America*, 896 F. Sup. 163, 165 (S.D.N.Y. 1995) (summary judgment for surety where it was undisputed that surety "investigated and evaluated [the principal's] alleged defenses before settling"); *United States* v. *D Bar D Enterprises, Inc.*, 772 F. Sup. 1167, 1170 (D. Nev. 1991) (parties may expect surety to settle only after investigation of claims, counterclaims, and possible defenses); *Portland* v. *George D. Ward & Associates, Inc.*, supra, 89 Or. App. 457–58 (parties to indemnity agreement subjecting right to compromise claim against principal to sole discretion of surety must reasonably expect compromise and payment to be made only after investigation of claims, counterclaims and defenses asserted in underlying action). This authority from other jurisdictions further informs us, however, that a deficient investigation is not, *by itself*, sufficient to support a finding of bad faith.

See, e.g., *Frontier Ins. Co.* v. *International, Inc.*, supra, 124 F. Sup. 2d 1214 (negligent investigation of claims does not constitute bad faith in suretyship context where undisputed evidence showed good faith); *United States Fidelity & Guaranty Co.* v. *Feibus*, supra, 15 F. Sup. 2d 587 (rejecting principals' argument that surety had acted in bad faith where principals failed to submit evidence of dishonest purpose or improper motive in surety's failure to investigate claims); M. Klinger, G. Judd & G. Bachrach, The Surety's Indemnity Agreement: Law and Practice (2002) pp. 174–75 ("Cases addressing whether the surety exercised its settlement discretion in good faith . . . usually focus on the surety's claim handling activities. Factors courts consider *include* . . . whether the surety reasonably investigated the claim . . . ." [Emphasis added.]); E. Gallagher, Suretyship (2d Ed. 2000) p. 497 (same); J. Hinchey, supra, 22 Tort & Ins. L.J. 149, citing *Maryland Casualty Co.* v. *R & L Construction Co.*, 368 S.W.2d 134, 135 (Tex. App. 1963) ("the thoroughness of the investigation performed by the surety" is *one* factor to be considering in determining whether surety has settled in good faith).

Therefore, the failure to investigate, standing alone and not accompanied by other evidence of an improper motive, is not enough to constitute bad faith, and because as we previously have stated, our standard of bad faith requires more than mere negligence or unreasonable conduct, we agree that evidence indicating that National had failed to investigate PSE's claim properly is not, *by itself*, sufficient evidence of bad faith. Nevertheless, "[a]lthough mere negligence or failure to make the inquiries which a reasonably prudent person would make does not of itself amount to bad faith, if a party fails to make an inquiry for the purpose of remaining ignorant of facts which he believes or fears would disclose a defect in the transaction, he may be

found to have acted in bad faith." (Internal quotation marks omitted.) *Funding Consultants, Inc.* v. *Aetna Casualty & Surety Co.*, 187 Conn. 637, 644, 447 A.2d 1163 (1982). Accordingly, a surety's failure to conduct an adequate investigation of a claim upon a payment bond, when accompanied by other evidence, reflecting an improper motive, properly *may* be considered as evidence of the surety's bad faith.

2

The jury also reasonably could have found that National settled the claim upon the payment bond solely to protect its own self-interest. First, Mercede presented evidence from which the jury could have concluded that National had paid PSE because it was fearful of possible action by the insurance commissioner based upon National's failure to process the claim properly as required by the payment bond. Specifically, Mercede presented two witnesses who testified that Jortner had expressed concern about PSE's complaint with the insurance commissioner.[14]

Additionally, Mercede presented evidence from which the jury could have concluded that National's sole motivation to settle PSE's claim upon the payment bond had been to release itself from PSE's claims that National had acted in bad faith and had violated CUTPA

---

[14] John Nettis, an insurance agent who had negotiated the surety relationship between National and Mercede, testified that Jortner had told him that "[h]e was concerned that . . . due to the fact that the attorney for PSE had gone to the insurance department that this would put CNA [Surety] in a bad light with the insurance department. And in the event they were called upon to pay, the insurance department could assess them treble damages." In addition, Mercede presented the testimony of Peter Mazza, a claims consultant who had assisted Mercede with the PSE claim. Mazza testified that "Jortner was extremely nervous and upset" that a complaint had been sent to the insurance commissioner. Mazza further testified that, at the May, 1999 meeting in which Jortner had urged Mercede to pay $177,000 to PSE, Jortner had indicated that "he was crazed about the insurance commissioner."

by failing to perform in accordance with the terms of the bond. Specifically, Mercede submitted evidence that in August, 1999, shortly after PSE had filed its original complaint against National and Mercede, counsel for National met with counsel for PSE, without Mercede's knowledge, in an attempt to settle PSE's bad faith and CUTPA claims against National. Moreover, the e-mail that National unsuccessfully sought to exclude from evidence; see part IV A of this opinion; also allowed the jury to find that National had settled with PSE in order to avoid the bad faith counts in PSE's complaint against National. That e-mail expressly revealed that National was interested in knowing how much PSE wanted in exchange for dropping its bad faith and CUTPA claims against National.

Furthermore, Mercede submitted to the jury evidence suggesting that the timing and circumstances surrounding National's settlement on the eve of trial was suspect. On the day jury selection was to begin, National made a $500,000 payment to PSE in exchange for a release of all claims against National; National, however, did not obtain a release of the claims PSE was asserting against Mercede. Rather, National became the beneficiary of PSE's claims against Mercede when PSE expressly assigned its claims against Mercede to National. On the basis of this evidence, the jury could have inferred that, if the $700,000 in payments made to PSE truly had been in settlement of PSE's claims against the payment bond, as opposed to settling PSE's claims for bad faith and CUTPA violations against National, National would have obtained a release that released both it and Mercede.

National argues that, from the evidence presented, the jury should have found that its settlement with PSE was proper, both as to motivation and execution. National claims that the testimony of Peter Mazza and John Nettis; see footnote 14 of this opinion; regarding

Jortner's concern about the insurance commissioner was self-serving, and that Mercede presented no evidence that the insurance commissioner had ever acted on the PSE complaint. National further argues that the jury should have found that at least $500,000 of the $700,000 had been paid to PSE to settle PSE's legitimate claims on the payment bond for retainage, extra work, change order work, and delay costs. Specifically, National claims that it presented overwhelming evidence supporting Jortner's decision that PSE actually was owed money under the payment bond for base work and extra work performed. Additionally, National argues that, at trial, Mercede's evidence never addressed the merits of PSE's claim, but challenged only the details surrounding National's settlement with PSE. National claims that it had made it clear to Mercede, in a timely manner, that National believed that PSE was a proper claimant under the payment bond, and that Jortner repeatedly advised Mercede that he believed there was no defense to the claim regarding the $150,000 retainage. Lastly, National points out that neither the indemnity agreement, nor the law, requires that a surety enter into a joint defense agreement with a principal.

The issue of whether National settled with PSE solely in its self-interest required the jury to evaluate the credibility of several key witnesses, many of whom contradicted one another. Issues of credibility are uniquely within the province of the jury and therefore we will not endorse the testimony of one witness over another. Moreover, as we have stated earlier, "the factfinder is not required to draw only those inferences consistent with one view of the evidence, but may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *In re Keijam T.*, supra, 221 Conn. 123. Even if we were to assume there-

fore, as we must, that the jury found these issues of fact entirely in Mercede's favor, we cannot say that the jury could not reasonably and legally have concluded that National acted solely out of self-interest.

Again, whether a self-interested settlement, like the failure to investigate properly, constitutes bad faith is an issue we have not had to consider, and the case law purporting to answer this question is sparse.[15] It is particularly noteworthy, however, that those cases upholding self-interested settlements have qualified the settlement, either explicitly or implicitly, by the terms "good faith." See, e.g., *Gundle Lining Construction*

[15] We recognize the authority holding that a surety is not acting in bad faith in seeking indemnification from a principal simply because the principal objected to and raised colorable defenses to payments made by the surety to the claimant. See, e.g., *Transamerica Ins. Co.* v. *Avenell*, 66 F.3d 715, 718, 721 (5th Cir. 1995) (surety's settlement of litigation over principal's objections not bad faith); *General Accident Ins. Co. of America* v. *Merritt-Meridian Construction Corp.*, 975 F. Sup. 511, 518 (S.D.N.Y. 1997) (no bad faith wherein surety settled claims despite possible defenses by principal). This is true because, under an indemnity agreement, it is not essential that a principal be liable for the claims upon which the surety seeks to be indemnified. See, e.g., *Frontier Ins. Co.* v. *International, Inc.*, supra, 124 F. Sup. 2d 1215 (liability of principal not prerequisite to surety's right to reimbursement); *United States Fidelity & Guaranty Co.* v. *Feibus*, supra, 15 F. Sup. 2d 583 (same); *Employers Ins. of Wausau* v. *Able Green, Inc.*, supra, 749 F. Sup. 1103 ("courts have consistently held that the surety is entitled to reimbursement pursuant to an indemnity contract for any payments made by it in a *good faith belief that it was required to pay*, regardless of whether any liability actually existed" [emphasis in original]); *Fireman's Fund Ins. Co.* v. *Nizdil*, 709 F. Sup. 975, 976–77 (D. Or. 1989) ("[a]ny claim asserted against the surety, regardless if it is valid or outside the scope of the bond triggers the obligation to indemnify the surety"); *Fidelity & Deposit Co. of Maryland* v. *Fleischer*, supra, 772 S.W.2d 816 (surety "had the right to settle any claim in good faith whether or not liability, necessity or expediency existed"); *International Fidelity Ins. Co.* v. *Spadafina*, supra, 192 App. Div. 2d 639 (surety entitled to indemnification, regardless of whether principal liable on underlying debt); *Hess* v. *American States Ins. Co.*, supra, 589 S.W.2d 551 (liability of principal not condition precedent to surety's right of recovery on indemnity agreement). We note that Mercede raised defenses to National against recovery under the bond by PSE. This case, however, does not turn on that mere assertion, but involves additional specific claims of bad faith and evidence in support thereof.

*Corp.* v. *Adams County Asphalt, Inc.*, supra, 85 F.3d 210 (surety did not act in bad faith by settling claim when principal refused to cooperate); *Transamerica Ins. Co.* v. *Bloomfield*, supra, 401 F.2d 362 ("[t]he surety had the right to settle and compromise the claims which were asserted against it but in so doing it was required to act in good faith"); *United States Fidelity & Guaranty Co.* v. *Feibus*, supra, 15 F. Sup. 2d 586 (upholding surety's right to indemnification "for claims paid to protect its own interests, as long as the payments were made in good faith"); *Employers Ins. of Wausau* v. *Able Green, Inc.*, supra, 749 F. Sup. 1103 (surety did not act in bad faith by settling claims where principal failed to request that surety litigate claims or post collateral to cover legal expenses as required under indemnity agreement); *Windowmaster Corp.* v. *Morse/Diesel, Inc.*, 722 F. Sup. 1532, 1534 (N.D. Ill. 1988) (surety had exclusive right "to determine in good faith how to handle suits upon validly issued bonds"); *Arntz Contracting Co.* v. *St. Paul Fire & Marine Ins. Co.*, supra, 47 Cal. App. 4th 486 ("[i]t is certainly true that indemnification is not precluded *just because* a surety is motivated to settle a case 'for its own benefit' " [emphasis added]); *Safeco Ins. Co. of America* v. *Gaubert*, 829 S.W.2d 274, 282 (Tex. App. 1992) ("as long as [the surety] acted in 'good faith,' its determination [to settle] would have been 'final and conclusive' ").

The case that is most often cited in regard to the issue of self-interested settlement is instructive. In *Fidelity & Deposit Co. of Maryland* v. *Bristol Steel & Iron Works, Inc.*, supra, 722 F.2d 1165–66, the United States Court of Appeals for the Fourth Circuit concluded that sureties were entitled to indemnification, pursuant to an indemnity agreement, for a settlement that the sureties had made for the sole purpose of protecting their own self-interest. The sureties initially had disputed a claim on a performance bond and had asserted the principal's

defenses. Id., 1164. Consequently, the Pennsylvania department of transportation, which had executed the construction contract with the principal, declared the principal and its sureties in default on the construction contract, and as a result of that default, disqualified the sureties from issuing bonds on any subsequent department of transportation construction projects. Id. Faced with the threat of being blacklisted, the sureties settled. The District Court, after a trial without a jury, had awarded the sureties indemnification, and the Fourth Circuit affirmed that decision, stating that there was "no justification for a finding of bad faith or fraud simply because [the sureties] made the payment to secure their removal from [the Pennsylvania department of transportation's] blacklist as a surety on road work in Pennsylvania." Id., 1165, citing *United States Fidelity & Guaranty Co.* v. *Sandoval*, 223 U.S. 227, 32 S. Ct. 298, 56 L. Ed. 415 (1912).

The court began its analysis by stating the basic rule: sureties must be indemnified for payments made in good faith. It is clear, however, from the facts noted by the court in *Fidelity & Deposit Co. of Maryland,* that there was no evidence that could have supported a finding of bad faith other than the self-interested settlement. First, the principal, with full knowledge of the sureties' payment and the purpose for it, never objected to the payment. *Fidelity & Deposit Co. of Maryland* v. *Bristol Steel & Iron Workers, Inc.,* supra, 722 F.2d 1164–65. In fact, the principal sent a letter to the sureties stating that the sureties' actions were reasonable under the circumstances; it was only after receipt of this letter that the sureties made payment to the claimant. Id., 1165. The court also noted how the sureties "sought in making their payment to protect fully the interests of the [principal]." Id. We note further that under the applicable law in Pennsylvania, the principal was bound "not simply to indemnify the surety but to keep it unmolested

. . . ." (Internal quotation marks omitted.) Id. There-fore, the court in that case faced only with a claim of a self-interested settlement, unblemished by any other evidence of bad faith, determined that the surety was not barred from seeking its right of indemnification.

Those facts are distinguishable from the present case wherein the jury reasonably could have found that the principal, Mercede, at various times, either was unaware of the fact that National was making payments to PSE, or had objected to those payments once it was made aware of them. In fact, Mercede presented evidence showing that, initially, National actually had supported Mercede's defenses against PSE's claims against the payment bond. Mercede also presented evidence that, only after PSE had filed a complaint with the insurance commissioner and had threatened litigation against National based upon bad faith and CUTPA claims, did National abandon this approach. Moreover, we observe that Pennsylvania law required the principal in *Fidelity & Deposit Co. of Maryland* " 'not simply to indemnify the surety but to keep it unmolested' "; id.; a standard not at play in the present case. Therefore, unlike in *Fidelity & Deposit Co. of Maryland,* the self-interested settlement in the present case was not cloaked in good faith garb, but, rather, was tainted by a confluence of circumstances from which a jury could properly have inferred improper motive.

We recognize, due to the unique nature of the tripar-tite relationship among surety, principal and claimant, that a surety may subject itself to bad faith claims from the claimant simply by defending the principal and refusing to settle the claimant's demand upon the pay-ment bond. Similarly, a surety may face claims, such as in this case, by its principal, when it settles with a claimant. Consequently, sureties, by the nature of their business, may find themselves caught between Scylla

and Charybdis.[16] As a result, even though motives of self-interest *may* constitute bad faith under some circumstances, it does not follow that the self-interested exercise of rights under a contract *necessarily* constitutes a per se violation of the implied covenant of good faith and fair dealing. See *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*, supra, 47 Cal. App. 4th 485–86 ("[a] surety's exposure to . . . [a] bad faith claim *may be* a reasonable ground for settling bond litigation that will not preclude indemnification" [emphasis added]).

Inherent in this determination is our appreciation of the public policy supporting the discretion afforded a surety under an indemnity agreement, in that, such agreements make it possible for a surety to compensate unpaid subcontractors and vendors or to complete a project in response to a performance bond claim without having to await the adjudication of every possible defense by the principal. See, e.g., *Transamerica Ins. Co. v. Bloomfield*, supra, 401 F.2d 363 (purpose of indemnity agreement is to facilitate handling of settlements and protect sureties from unnecessary litigation); *United States Fidelity & Guaranty Co. v. Feibus*, supra, 15 F. Sup. 2d 585 (same). Additionally, we are cognizant of how obligees or claimants can hold sureties hostage by merely alleging bad faith against them. See *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*, supra, 47 Cal. App. 4th 485 ("[s]uch allegations are easily made, and may be based on nothing more tha[n] an obligee's [or claimant's] interest in frightening a surety into settling").

Although we acknowledge the policy behind a surety's discretionary authority, we also question, however,

---

[16] This situation has also been dubbed the surety's " 'classic dilemma.' " *Associated Indemnity Corp. v. CAT Contracting, Inc.*, supra, 964 S.W.2d 282, citing J. Hinchey, supra, 22 Tort & Ins. L.J. 133.

the wisdom of allowing potentially suspect claims to control or interfere with the contract obligations between a principal and its surety.[17] Where a self-interested settlement is accompanied by an improper motive, courts have held that bad faith can preclude indemnification. Id., 485–86 (holding indemnification of settlement costs properly denied where costs were attributable to obligee's action against surety for bad faith claims *and* claims involving wilful malfeasance in managing project); see also *United States Fidelity & Guaranty Co.* v. *Feibus*, supra, 15 F. Sup. 2d 586–87 (no evidence submitted that surety made payments because of "improper motive or purpose"). We agree. Therefore, consistent with the aforementioned cases, and recognizing the difficulties associated with the surety business, we conclude that a self-interested settlement, when accompanied by other evidence of improper motive, can constitute bad faith.

Obviously, what constitutes good faith or lack thereof depends on the facts of each case. In this instance, we conclude that the jury reasonably could have determined that National had breached the implied covenant of good faith and fair dealing based upon all the evidence supporting Mercede's claims that National, inconsistent with justified expectations and unfaithful to its duty under the implied covenant, both failed to investigate adequately *and* improperly settled PSE's claims solely out of self-interest.[18] Thus, the trial court's

---

[17] This is particularly problematic when the indemnity agreement, as in the present case, did not give the principal the option of posting collateral and determining for itself whether suspect claims should be litigated. See *Fidelity & Deposit Co. of Maryland* v. *Fleischer*, supra, 772 S.W.2d 816 (noting significance of indemnitor's failure to take advantage of such option).

[18] We note that the overwhelming majority of cases deciding in favor of sureties in their claims for indemnification were decided by summary judgment, without the development of the factual record present in the this case. See, e.g., *Transamerica Ins. Co.* v. *Avenell*, 66 F.3d 715, 721 (5th Cir. 1995) (affirming summary judgment where there was no factual support for allegations of surety's bad faith); *Continental Casualty Co.* v. *American Security Corp.*, supra, 443 F.2d 652 (affirming summary judgment for surety

failure to direct a verdict in favor of National on its indemnification claim was not improper.

## B

Lastly, National argues that the jury's conclusion that National was not entitled to recover its attorney's fees and costs associated with its investigation and defense of PSE's payment bond claims contradicted the express language of the indemnity agreement. Therefore, according to National, the verdict should be set aside and the issue tried to the court to determine the amounts of recoverable fees and costs.[19] Our law regard-

where uncontradicted affidavit provided that all claims had been paid by surety " 'in good faith after investigation' "); *Elm Haven Construction Ltd. Partnership* v. *Neri Construction*, United States District Court, Docket No. 3:01CV1307 (D. Conn. September 11, 2003) (principal's claim that surety breached implied covenant of good faith and fair dealing presented no genuine issue of material fact); *Frontier Ins. Co.* v. *International, Inc.*, supra, 124 F. Sup. 2d 1214 (granting summary judgment for surety where there was "no evidence" that surety made payments based on improper motive or purpose); *General Accident Ins. Co. of America* v. *Merritt-Meridian Construction Corp.*, 975 F. Sup. 511, 518 (S.D.N.Y. 1997) ("[c]onclusory allegations of bad faith are insufficient to defeat a motion for summary judgment in favor of a surety seeking to enforce an indemnification agreement"); *Banque Nationale de Paris S.A.* v. *Ins. Co. of North America*, supra, 896 F. Sup. 165 (granting summary judgment for surety where "[t]here is not a scintilla of evidence, as distinct from conclusory assertions, that [the surety] acted inappropriately"); *Transamerica Ins. Co.* v. *H.V.A.C. Contractors, Inc.*, 857 F. Sup. 969, 974 (N.D. Ga. 1994) (granting summary judgment where defendants' only allegation of bad faith was "unsupported accusation" regarding inflated payments); *Reliance Ins. Co.* v. *Romine*, 707 F. Sup. 550, 552 (S.D. Ga. 1989) (granting summary judgment for surety where record "devoid" of evidence of bad faith); *Fireman's Fund Ins. Co.* v. *Nizdil*, 709 F. Sup. 975, 977 (Or. 1989) (granting summary judgment where defendant did not contend that sureties settled claims against bond in bad faith); *United States Fidelity & Guaranty Co.* v. *Klein Corp.*, supra, 190 Ill. App. 3d 256 (affirming summary judgment for surety where principals "failed to introduce any evidence of fraud or bad faith"); *United States Fidelity & Guaranty Co.* v. *Napier Electric & Construction Co.*, supra, 571 S.W.2d 646 (remanding case with direction to render judgment for surety where no proof of bad faith or fraud and sufficient evidence that payments made in good faith).

[19] Paragraph two of the indemnity agreement provided in relevant part: "[Mercede] will indemnify and save [National] harmless from and against

ing contract interpretation is well settled. "Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." (Internal quotation marks omitted.) *Poole* v. *Waterbury*, supra, 266 Conn. 88. In the present case, however, National stipulated,[20] and conceded several times at the charging conference, that the issue of *whether* it was entitled to fees pursuant to paragraph two of the indemnity agreement should be decided by the jury, and that if the jury decided that National *were* entitled to those fees, the court would determine the amount of those costs and fees. By agreeing to submit the entitlement issue to the jury, National effectively waived any right it might have had to an automatic award of attorney's fees under the indemnity agreement. See *Lanna* v. *Greene*, 175 Conn. 453, 458, 399 A.2d 837 (1978) ("The general rule is that a party for whose benefit a provision in a contract is intended may waive his rights under such provision. 3A Corbin, Contracts 761."). Therefore, we review this matter to determine only whether the jury reasonably could have concluded that National was not entitled to attorney's fees and costs associated with

---

every . . . cost . . . and expense which [National] may pay or incur in consequence of having executed . . . such bonds . . . including, but not limited, to fees of attorneys . . . and the expense of procuring, or attempting to procure, release from liability, or in bringing suit to enforce the obligation of [Mercede] under this Agreement. In the event [National] deems it necessary to make an independent investigation of a claim, demand or suit, [Mercede] acknowledge[s] and agree[s] that all expense attendant to such investigation is included as an indemnified expense."

[20] The trial court referenced this stipulation in its instructions to the jury on this issue: "The parties have stipulated that the amount of any award of fees of attorneys, costs and expenses claimed by National pursuant to the [indemnity agreement] will be handled by [the trial court] at a later date. So, you are only to determine *if* such fees should be awarded. . . . National is claiming it is entitled to [an] award of attorney's fees by . . . reason of paragraph two of the [indemnity agreement]." (Emphasis added.)

its investigation and defense of PSE's complaint. See *Cohen* v. *Yale-New Haven Hospital,* supra, 260 Conn. 761.

The jury found that Mercede had proven by a preponderance of the evidence that National had breached its implied covenant of good faith and fair dealing. Subsumed in this finding is the jury's implicit finding that National's payments to PSE were not the result of PSE's claims under the payment bond. Therefore, the evidence in support of the jury's finding that National was not entitled to receive attorney's fees and costs is entangled with the other issues we have resolved in this opinion.

### III

We next address National's broad contention that the trial court improperly instructed the jury concerning the implied covenant of good faith and fair dealing. National's arguments can be divided into three separate categories. First, National claims that the jury instruction was improper and harmful because it disregarded the express terms of the indemnity agreement. Second, National argues that when the trial court read a list of fourteen factors that the jury might consider in determining whether National had acted in bad faith, the effect of the overall charge was that any one of the items on the list would constitute a per se violation of the implied covenant of good faith and fair dealing. Third, National contends that the trial court improperly excluded particular language from the instruction. We disagree and address each contention in turn.

We reiterate the appropriate standard of review. "When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a

court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . We do not critically dissect a jury instruction." (Internal quotation marks omitted.) *Schoonmaker* v. *Lawrence Brunoli, Inc.*, supra, 265 Conn. 238–39.

National's first claim, namely, that the jury instruction was improper because it disregarded the express terms of the indemnity agreement, is inextricably intertwined with National's incorrect belief that, as a matter of law, it did not owe Mercede an implied duty of good faith. Accordingly, in resolving this issue, we simply refer to part II of this opinion. To the extent that National argues that the implied covenant of good faith cannot be applied, in and of itself, to achieve a result contrary to the express terms of the indemnity agreement, we agree. See *Verrastro* v. *Middlesex Ins. Co.*, supra, 207 Conn. 190. We conclude, however, that the trial court's instruction to the jury on good faith, when "considered in its entirety . . . and judged by its total effect rather than by its individual component parts," was consistent with this proposition. *Schoonmaker* v. *Lawrence Brunoli, Inc.*, supra, 265 Conn. 238–39. In fact, on two separate occasions, the court reminded the jury that "National [had] the exclusive right to settle any and all construction bond claims, including those arising under the payment bond in this case."

We similarly reject National's second claim, that the jury instructions were improper because a list of four-

teen factors,[21] which the trial court presented to the jury to use in determining whether National had acted in bad faith, improperly led the jury to believe that any one of the items on the list would constitute a per se violation of the implied covenant of good faith and fair dealing.

Our review of the record reveals that, although National objected at the charging conference to six of the fourteen items on the list,[22] it did not object

[21] The trial court charged the jury concerning these factors as follows: "In determining whether National performed in good faith, you should consider the following: Whether National considered and paid amounts that Mercede was disputing that were due under the payment bond. Whether National conducted a reasonable investigation. Whether National acted in its own self-interest. Whether [National] was settling claims PSE asserted against it for which Mercede was not responsible for the amounts claimed under bad faith and CUTPA. Whether [National] responded promptly to PSE under the terms of the payment bond. Whether it responded within forty-five days as required by the payment bond. Whether National considered colorable defenses asserted by Mercede. Whether National acted as a volunteer in making the payments to PSE for which it had no legal responsibility under the payment bond. Whether National acted as a volunteer in making the payments to PSE to settle National's exposure for bad faith and/or CUTPA damages to PSE. Whether PSE had asserted sufficient claim as state[d] in PSE's October 10, 2000 revised and amended complaint. Whether National made an unreasonable demand for collateral. Whether National settled due to fear of actions by the Connecticut insurance commissioner. Whether conduct of National in refusing to issue consent of surety include[d] sending a letter to Turner [Construction] Company. And whether the amount paid in settlement to PSE was reasonable. *You need not find all of these allegations have been proven by the evidence for you to find a violation of the implied covenant of good faith and fair dealing. You must decide whether National fulfilled its obligation to exercise good faith.*" (Emphasis added.)

[22] Briefly stated, National specifically objected to the following: (1) the absence of the clause "furtive design or ill will," from the definition of bad faith; (2) the failure to use the language "whether National had an obligation to conduct an investigation" instead of "whether National conducted a reasonable investigation"; (3) the omission of the word "solely" from the phrase "whether [National] acted in its own self-interest"; (4) the omission of the word "solely" from "whether [National] was settling claims PSE asserted against it for which [Mercede] was not responsible"; (5) the instruction regarding "whether [National] acted as a volunteer in making payments" to PSE "for which it had no legal responsibility" under the payment bond;

specifically to either the inclusion of a list within the jury charge or the overarching effect of such a list. In fact, during the charging conference, National's counsel played an active role in negotiating the phrasing of several of the items that were on the list. More importantly, however, we note that after setting forth the fourteen specific factors the jury could consider in making its finding, the trial court explicitly instructed the jury as follows: "You need not find *all* of these allegations have been proven by the evidence for you to find a violation of the implied covenant of good faith and fair dealing." (Emphasis added.) Therefore, National's contention that the jury was led to believe that *any one* of the items on the list would constitute a per se violation of the implied covenant of good faith and fair dealing fails.

Finally, National argues that the trial court improperly excluded particular language from the jury instructions. According to National, the court improperly failed to recite the entire instruction on the covenant of good faith and fair dealing set forth in *Buckman* v. *People Express, Inc.*, supra, 205 Conn. 171. Specifically, the court omitted the following language from its instructions: "[Bad faith] contemplates a state of mind affirmatively operating with furtive design or ill will." (Internal quotation marks omitted.) Id. National's proposed jury instruction regarding the good faith issue included the "furtive design or ill will" language, and when the trial court decided not to include it during the charging conference, National objected; therefore, its claim concerning this instruction is preserved.

After the trial court enumerated the fourteen factors that the jury could consider in determining whether National had performed in good faith; see footnote 21

---

and (6) the instruction regarding "[w]hether PSE ha[d] asserted sufficient claim as stated in PSE's October 10, 2000 revised and amended complaint."

of this opinion; the trial court stated the following: "You must decide whether National fulfilled its obligation to exercise good faith. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with justified expectations of the other party. Good faith and fair dealing mean an attitude or state of mind denoting honesty of purpose and freedom from intention to defraud. It means being faithful to one's duty and obligation under the contract. Good faith is defined as the opposite of bad faith. If National engaged in bad faith, you must find that it did not fulfill the implied covenant. Bad faith generally implies a design to mislead or to deceive another or neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's right or duties. Bad faith is simply not bad judgment or negligence, but it implies the conscious doing of a wrong because of dishonest purpose."

National argues that the trial court's failure to include the "furtive design or ill will" language from *Buckman* was improper because that phrase is a required element in a good faith jury instruction under Connecticut law. Specifically, National argues that such language is necessary because bad faith requires "proof that goes beyond the potential ill feelings between parties when one exercises a contractual right to the detriment of the other" and that the court's omission kept the jury from understanding that "unhappiness" was "not the equivalent of bad faith." We conclude, however, after reading the jury charge as a whole, that the charge adequately conveyed to the jury the law regarding good faith, and therefore was proper.[23]

---

[23] We note that, when we adopted the "improper motive" standard of bad faith in part II of this opinion, we based that decision, in part, on the fact that the standard was consistent with our definition of bad faith in *Buckman*, including the "furtive design or ill will" language. See *Buckman* v. *People Express, Inc.*, supra, 205 Conn. 171. Although that express language is helpful in relaying the definition of bad faith to a jury, as we conclude herein, the jury instructions here adequately expressed the law.

## IV

### A

We next turn to National's claim that the trial court abused its discretion[24] by admitting into evidence an e-mail message that Bradley Wolfe, National's counsel, had sent to Jortner. Specifically, National claims that the trial court should have precluded this e-mail from evidence because it is protected by the attorney-client privilege. We disagree.

The following additional facts are relevant to our resolution of this issue. In August, 1999, shortly before PSE had filed its original complaint in this action, Wolfe met with David Rosengren, counsel for PSE, to discuss the possibility of a settlement of PSE's claims against National. On August 6, 1999, Wolfe sent an e-mail message to Jortner, reporting on his meeting with PSE's counsel. The message provided in relevant part: "I again asked what it would take to avoid the bad faith counts, in exchange for payment of totally uncontested funds. Rosengren again had no number in mind, but understood the concept of the question and will be getting

---

[24] In its brief to this court concerning this issue, National sets forth the proper abuse of discretion standard for review, but invokes plain error review on this issue as well. The plain error doctrine, however, is inapplicable to this situation, as it provides appellate review of claims unpreserved at trial. Practice Book § 60-5 provides in relevant part: "The court may in the interests of justice notice plain error *not brought to the attention of the trial court. . . .*" (Emphasis added.) See *State* v. *Ramos,* 261 Conn. 156, 171, 801 A.2d 788 (2002). Moreover, "[p]lain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Andresen,* 256 Conn. 313, 336, 773 A.2d 328 (2001). At trial, National properly objected to the disclosure of this e-mail. Accordingly, we will not engage in a plain error analysis regarding this issue.

back to me. The entire [conversation] was 'off the record.' "[25]

During discovery, National inadvertently disclosed the contents of this e-mail message, along with the contents of two other e-mail messages sent between National and its counsel. National thereafter filed a motion in limine seeking to preclude Mercede from using the contents of the messages at trial. At the beginning of trial, the trial court issued a preliminary ruling that the August 6, 1999 e-mail message was admissible. Specifically, the trial court ruled that this e-mail was not protected by the attorney-client privilege because it merely transmitted information concerning a meeting between counsel for National and counsel for PSE.[26] Thereafter, Mercede referred to this e-mail in its opening statement.

National renewed its objection to the admissibility of the August 6, 1999 e-mail message at trial, during Mercede's cross-examination of Jortner. National argued that the message was inadmissible because it was: (1) protected by the attorney-client privilege; (2) irrelevant; and (3) prejudicial. The trial court overruled National's objection and admitted the e-mail into evidence as a full exhibit. Mercede used the e-mail in its cross-examination of Jortner and relied on it during closing arguments as circumstantial evidence that National had made its payments to PSE in bad faith because National was trying to avoid liability on PSE's claims of bad faith and CUTPA violations.

---

[25] The e-mail also revealed that, as a result of his meeting with PSE's counsel, Wolfe would be able to give Jortner "a pretty good idea of the exposure [National would] have," and also that PSE planned to file suit in the near future to avoid any statute of limitations issue.

[26] Concurrently, the trial court ruled that the two other e-mails that were disclosed, dated August 5 and August 18, 1999, were protected by the attorney-client privilege and that National's inadvertent disclosure of them did not waive the privilege. The trial court's ruling regarding these other two e-mails is not at issue in this appeal.

On appeal, National contends that the attorney-client privilege protected the e-mail from disclosure since the e-mail was "inextricably linked" to National's legal strategy concerning PSE's claims against them. National also claims, in the alternative, that the trial court should have ruled that the e-mail message was inadmissible as irrelevant evidence. Finally, National claims that the trial court should have precluded the introduction of the e-mail message pursuant to § 4-8 of the Connecticut Code of Evidence,[27] because the message reflected an off-the-record settlement discussion between counsel for National and counsel for PSE.

Before addressing the merits of National's claims, we set forth the standard by which we review them. "The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *State* v. *Dehaney*, 261 Conn. 336, 354–55, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003). "When reviewing claims under an abuse of discretion standard, the

[27] Section 4-8 of the Connecticut Code of Evidence provides: "(a) General rule. Evidence of an offer to compromise or settle a disputed claim is inadmissible on the issues of liability and the amount of the claim.

"(b) Exceptions. This rule does not require the exclusion of:

"(1) Evidence that is offered for another purpose, such as proving bias or prejudice of a witness, refuting a contention of undue delay or proving an effort to obstruct a criminal investigation or prosecution, or

"(2) statements of fact or admissions of liability made by a party."

unquestioned rule is that great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness . . . ." (Internal quotation marks omitted.) *Schilberg Integrated Metals Corp.* v. *Continental Casualty Co.*, 263 Conn. 245, 274, 819 A.2d 773 (2003). "In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did." (Internal quotation marks omitted.) *Simmons* v. *Simmons*, 244 Conn. 158, 175, 708 A.2d 949 (1998).

In the present case, however, the specific issue before us is whether the attorney-client privilege protected this e-mail from disclosure. "Therefore, [t]he scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Blumenthal* v. *Kimber Mfg., Inc.*, 265 Conn. 1, 7, 826 A.2d 1088 (2003). Our limited task is to decide whether, based on the facts, the trial court's conclusions of law are legally and logically correct.

"On numerous occasions we have reaffirmed the importance of the attorney-client privilege and have recognized the long-standing, strong public policy of protecting attorney-client communications. . . . In Connecticut, the attorney-client privilege protects both the confidential giving of professional advice by an attorney acting in the capacity of a legal advisor to those who can act on it, as well as the giving of information to the lawyer to enable counsel to give sound and informed advice. . . . The privilege fosters full and frank com-

munications between attorneys and their clients and thereby promote[s] the broader public interests in the observation of law and [the] administration of justice." (Internal quotation marks omitted.) Id., 9–10. We note further that "[a]lthough the existence of the privilege encourages the candor that is necessary for effective legal advice . . . the exercise of the privilege tends to prevent a full disclosure of the truth in court." (Citations omitted.) *State* v. *Cascone*, 195 Conn. 183, 188, 487 A.2d 186 (1985). Therefore, the privilege is strictly construed. *Ullmann* v. *State*, 230 Conn. 698, 710, 647 A.2d 324 (1994); *Turner's Appeal*, 72 Conn. 305, 318, 44 A. 310 (1899).

Not every communication between client and attorney, however, is protected by the attorney-client privilege. "As a general rule, [c]ommunications between client and attorney are privileged when made in confidence for the purpose of seeking legal advice." (Internal quotation marks omitted.) *Blumenthal* v. *Kimber Mfg., Inc.*, supra, 265 Conn. 10. "A communication from attorney to client solely regarding a matter of fact would not ordinarily be privileged, unless it were shown to be inextricably linked to the giving of legal advice." (Internal quotation marks omitted.) *Olson* v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 157, 757 A.2d 14 (2000). The burden of proving each element of the privilege, by a fair preponderance of the evidence, rests with National, as it is the party seeking to assert the privilege. *State* v. *Hanna*, 150 Conn. 457, 466, 191 A.2d 124 (1963).

The August 6, 1999 e-mail resembles a progress report from Wolfe to his client, and it merely paraphrases the discussion that had transpired between Wolfe and counsel for PSE. "One of the essential elements of the claim of privilege between attorney and client is that the communication be confidential." *Rienzo* v. *Santangelo*, 160 Conn. 391, 395, 279 A.2d 565 (1971). "Statements

made in the presence of a third party, on the other hand, are usually not privileged because there is then no reasonable expectation of confidentiality."[28] (Internal quotation marks omitted.) *Ullmann* v. *State*, supra, 230 Conn. 711; *State* v. *Cascone*, supra, 195 Conn. 186. In the e-mail, Wolfe merely reported back to his client what he had said to a third party and how that third party had responded. As the trial court described it, "[i]t is a reconstitution of an event that occurred with third parties involved." Such a communication is not confidential. Moreover, "statements that are meant to be transmitted to another are not confidential." C. Tait, Connecticut Evidence (3d Ed. 2001) § 5.23.2, p. 320, citing *State* v. *Yates*, 174 Conn. 16, 20, 381 A.2d 536 (1977); see *State* v. *Burak*, 201 Conn. 517, 526, 518 A.2d 639 (1986) (holding statements by client's attorney to opposing attorney concerning plea arrangement not privileged). National's claim that the e-mail was privileged because its contents were "inextricably linked" to the giving of legal advice overlooks the fundamental requirement that the communication be confidential in order to qualify for the privilege in the first instance.[29]

[28] We have recognized, however, that "[t]he presence of certain third parties . . . *who are agents or employees* of an attorney or client, *and who are necessary to the consultation*, will not destroy the confidential nature of the communications." (Emphasis added; internal quotation marks omitted.) *Olson* v. *Accessory Controls & Equipment Corp.*, supra, 254 Conn. 157 (citing supporting cases). National does not claim that PSE's counsel should be considered a member of this unique class of persons whose communications are also protected by the attorney-client privilege, nor would the facts support such an argument.

[29] National also claims that this e-mail is privileged because it is "related to" an e-mail sent one day prior that the trial judge determined to be protected by the privilege and thus inadmissible. This court is unaware of any doctrine that transfers the privilege from one confidential document to another document that, while it may be related to the initial document in time or general subject matter, is not confidential, nor does National cite to any case law in support of such a "relatedness" doctrine. The e-mail in question failed to qualify as a confidential communication, and therefore, was not protected from disclosure or admissibility by the attorney-client privilege.

National claims, in the alternative, that the trial court should have determined that the e-mail was not relevant, specifically because Wolfe had sent the e-mail more than two years prior to making settlement payments to PSE. The law defining the relevance of evidence is well settled. "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue." (Internal quotation marks omitted.) *State* v. *Andresen*, 256 Conn. 313, 336, 773 A.2d 328 (2001). "The trial court has wide discretion to determine the relevancy of evidence . . . . Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Rizzo*, 266 Conn. 171, 285, 833 A.2d 363 (2003). Wolfe sent the e-mail on August 6, 1999, more than two years before National made the first of its two payments to PSE. National claims that this temporal gap negated the probative value of the e-mail. We disagree. The e-mail in issue was probative of National's motives in making the payments to PSE. Accordingly, we conclude that the trial court properly determined that the e-mail was relevant.

Finally, National claims that the trial court should have excluded this e-mail because it was evidence of an offer of settlement, which is inadmissible under § 4-8 of the Connecticut Code of Evidence. The purpose of § 4-8, however, is to preclude the admission of settlement offers between parties who are opposing parties at the trial in which the evidence of the settlement is sought to be introduced. See generally *Tomasso Bros., Inc.* v. *October Twenty-Four, Inc.*, 221 Conn. 194, 198, 602 A.2d 1011 (1992) (explaining that policy behind exclusion of such evidence is to promote settlement of disputes between parties). Section 4-8 does not apply here because the e-mail pertains solely to settlement discussions between National and PSE, and not to the

possibility of settlement between National and Mercede. Indeed, National and Mercede were codefendants in the underlying action. Accordingly, § 4-8 does not preclude the admission of the e-mail into evidence.

## B

We next address National's claim that the trial court abused its discretion by overruling National's objections to testimony concerning an unrelated settlement agreement between an affiliate of National and the principal of one of its bonds, a company that had been represented in the unrelated matter by Mercede's present counsel. National claims that, although the trial court gave a curative charge instructing the jury to disregard this testimony, the testimony itself was so prejudicial as to necessitate a new trial. We disagree.

The following additional facts are relevant to our resolution of this issue. In October, 1999, Jortner received an e-mail message from Robert Campbell, an underwriter for one of National's affiliates. In the e-mail, Campbell referred to his prior dealings with Raymond Garcia, Mercede's present counsel. The e-mail provided in relevant part: "Having some experience with Garcia, I'm particularly interested in your reaction to whatever defenses he put forward. Some of them have got to be beauties."

At trial, Garcia conducted a direct examination of Campbell, in which he asked Campbell to explain the meaning of the e-mail message. Campbell testified that he had dealt with Garcia's office in an earlier bond dispute, which had proceeded to trial and resulted in a jury verdict against Campbell's company. One of the issues in that dispute involved a bad faith claim. Campbell further testified that he had "been in this business for thirty-two years and found a lot of outrageous claims from a lot of attorneys. . . . You're part of that." In addition to admitting that he was predisposed to believe

that some attorneys filed "outrageous claims," Campbell stated that he may have conveyed this belief to Jortner. At the conclusion of the evidence, National requested that the trial court give a curative charge instructing the jury to disregard the entire line of questioning regarding the settlement of this unrelated dispute. The trial court complied with this request.[30]

On appeal, National claims that the testimony concerning the settlement and the testimony revealing how that event had engendered negative feelings between National's employees and counsel for Mercede imputed bad faith to National by implying that National's motives to settle PSE's claims were improper. National contends that, despite the curative instruction, the testimony was so prejudicial as to require a new trial. We disagree. Even if we were to assume, arguendo, that the testimony was admitted improperly, we nevertheless conclude that the curative instruction sufficiently negated any potential prejudice.

National requested a curative charge regarding Campbell's testimony, and the trial court obliged in this request. The trial court's instructions to the jury, in relevant part, provided: "You are instructed to disregard any of the questions, comments or answers relating to [the settlement agreement] and you are further

---

[30] The trial court's curative charge instructed the jury as follows: "Now, in connection with the examination of [Campbell], attorney . . . Garcia, counsel of record for Mercede, made reference to another lawsuit in which [Garcia] and [Campbell] both participated. [Garcia] was obligated by a confidentiality clause and a written agreement in that other lawsuit not to disclose any of the details relating to the settlement of that litigation. The settlement agreement that is executed by both parties and counsel further states that nothing therein shall be construed to be a concession or admission of fault by either party. You are instructed to disregard any of the questions, comments or answers relating to this line of inquiry and you are further instructed not to draw any negative inferences or conclusion[s] as to CNA [Surety] or National as a result of that litigation or [Garcia's] line of inquiry as to his examination of [Campbell]."

instructed not to draw any negative inferences or conclusion as to CNA [Surety] or National as a result of that litigation or [Garcia's] line of inquiry as to his examination of [Campbell]." National does not claim that the curative charge itself was inadequate; rather, citing *John T. Brady & Co.* v. *Stamford*, 220 Conn. 432, 443, 599 A.2d 370 (1991), it claims only that the " 'bell of prejudice' could not be unrung here." Our jurisprudence is clear, however, that unless there is a clear indication to the contrary, a jury is presumed to follow the court's instructions. *State* v. *Negron*, 221 Conn. 315, 331, 603 A.2d 1138 (1992); accord *State* v. *Fields*, 265 Conn. 184, 207, 827 A.2d 690 (2003); *State* v. *McIntyre*, 250 Conn. 526, 533, 737 A.2d 392 (1999). There is no specific claim, nor any evidence with which to support a claim, that the jury ignored the trial court's instructions. We conclude that the court's unambiguous limiting instruction to the jury was sufficient to negate any potentially adverse effect of the admission of the testimony concerning the settlement agreement.

V

National next claims that the trial court improperly denied its motion to set aside the verdict because the jury's finding that National had breached the implied covenant of good faith and fair dealing was inconsistent with its finding that National had not breached the indemnity agreement. Our review of the record reveals, however, that National did not raise this issue before the trial court either in its motion to set aside the verdict or at oral argument on that motion. Because our review is limited to matters in the record, we will not address issues not decided by the trial court. Practice Book § 60-5 (court on appeal shall not be bound to consider claim unless distinctly raised at trial); *Celentano* v. *Oaks Condominium Assn.*, 265 Conn. 579, 589–90 n.9, 830 A.2d 164 (2003) (claims neither addressed nor decided

by trial court are not properly before appellate tribunal). Therefore, we decline to review this claim.

## VI

Finally, National claims that the trial court improperly submitted to the jury the special defenses of estoppel and waiver, and failed to direct a verdict in National's favor on those defenses, when according to National, Mercede could not prove the necessary elements of each defense. In light of our decision that the jury properly found that Mercede had proven its special defense that National had breached its implied covenant of good faith and fair dealing, thereby affirming the judgment in favor of Mercede on National's cross claim for indemnity, we need not address National's remaining claim.

The judgment is affirmed.

In this opinion the other justices concurred.