[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 16, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-14133

_____

D. C. Docket No. 05-00334-CV-ORL-31-GJK

AUTO-OWNERS INSURANCE COMPANY,

Appellee,

versus

SOUTHEAST FLOATING DOCKS, INC.,
ALAN L. SIMPSON,

Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 16, 2009)

Before BLACK and MARCUS, Circuit Judges, and QUIST,* District Judge.

PER CURIAM:

_____

* Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

The issue in this appeal is whether the district court erred when it granted a surety's motion for new trial after the jury found the surety settled a claim in bad faith. The surety, Auto-Owners Insurance Company (Auto-Owners), issued a bond in favor of Rivermar Contracting Company (Rivermar) securing the performance of Southeast Floating Docks, Inc., and its president, Alan Simpson (collectively Southeast). In connection with the bond, Southeast executed an indemnity agreement in favor of Auto-Owners. Rivermar made a claim on Southeast's bond, and Auto-Owners subsequently settled with Rivermar and paid the full amount of the bond. Auto-Owners filed suit against Southeast for indemnification for its losses resulting from what it maintained was a good faith payment of the bond to Rivermar. Southeast defended on the ground it was not required to indemnify Auto-Owners because Auto-Owners had settled with Rivermar in bad faith. The jury returned a verdict in favor of Southeast, finding by a preponderance of the evidence that Auto-Owners did not settle Rivermar's claim against the bond in good faith. The district court subsequently granted Auto-Owners' motion for a new trial, concluding Southeast failed to produce any credible evidence contradicting Auto-Owners' evidence that it acted in good faith and the jury's

2

conclusion on the issue of bad faith was against the great weight of the evidence.[1]

We reverse and reinstate the jury's verdict because it is supported by the evidence.

## I.   STANDARD OF REVIEW

Our review of a district court's grant of a new trial is "extremely stringent"

when the district court discards the verdict on the ground it is against the great

weight of the evidence.  *Redd v. City of Phenix City*, 934 F.2d 1211, 1215 (11th

Cir. 1991).  While it is within a district court's discretion to grant a new trial if it

finds a jury's "verdict is against the great, not merely the greater weight of the

evidence," our application of this more rigorous standard of review ensures the

district court does not simply substitute its own credibility choices and inferences

for the reasonable choices and inferences made by the jury.  *Id*. at 1214-15; *see*

*also Hardin v. Hayes*, 52 F.3d 934, 938 (11th Cir. 1995) (noting the scope of

discretion is narrower when the district court concludes the jury verdict was

---

[1]Auto-Owners also moved for judgment as a matter of law, which the district court denied because Auto-Owners failed to renew its Rule 50 motion before the case went to the jury. Before the case was retried, the district court granted Auto-Owners' motion for summary judgment against Southeast as to Southeast's liability for breaching the indemnity agreement, leaving only the amount of damages to be established; damages included attorneys' fees in addition to the amount of the bond.  With Southeast's liability established, in August 2007 the district court created a discovery schedule to determine the amount Southeast owed pursuant to the indemnity agreement.  Nine months later, in May 2008, Auto-Owners withdrew all pending claims for attorneys' fees and costs.  The district court then entered a final judgment for Auto-Owners in the amount of $1,135,658.89.  Southeast timely appealed.

contrary to the great weight of the evidence).[2]  If the jury's verdict is supported by the evidence, then it is immaterial that we or the district judge would have arrived at the same verdict because it is not our place to substitute our judgment for that of the jury.  *See Redd*, 934 F.2d at 1215; *Griffin v. Swim-Tech Corp.*, 722 F.2d 677, 679 n.1 (11th Cir. 1984) ("The question is whether or not reasonable jurors could have concluded as this jury did based upon the evidence presented.").

In our "extremely stringent" review, we will examine the legal standard by which the jury was instructed to evaluate Auto-Owners' duty of good faith in handling and settling of the claim, along with Southeast's theory of Auto-Owners' bad faith.[3]  In the subsequent sections of this opinion, we will consider the evidence the jury heard at trial and then determine whether reasonable inferences that could be drawn from the evidence support the jury's verdict.

---

[2] On the other hand, a deferential standard of review is appropriate if the district court's new trial order is precipitated by jury misconduct or other prejudicial trial events that "contaminate" the jury's deliberative process.  *See Redd*, 934 F.2d at 1215 & n.3; *Williams v. City of Valdosta*, 689 F.2d 964, 974 n.8 (11th Cir. 1982).  In this case, there has been no suggestion the jury's deliberative process was contaminated.  Thus, this deferential standard does not apply in this instance.

[3] We use the terms "bad faith" and "lack of good faith" interchangeably.

## II.  BACKGROUND

### A.  *The Legal Standard*

The jury was instructed that for Southeast to prove Auto-Owners settled the claim with Rivermar in bad faith, Southeast had the burden to establish by a preponderance of the evidence Auto-Owners acted with an improper motive or with a dishonest purpose.[4]  The jury was also instructed to analyze whether Auto-Owners' conduct was reasonable under the circumstances, because unreasonable conduct can be evidence of an improper motive.  Both parties and the district court relied on a factually analogous case, *PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.*, 838 A.2d 135 (Conn. 2004), which addressed a surety's duty of good

---

[4] The jury was instructed:

> [A] surety has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business. The surety must handle the claim, and make all decisions with regard to litigation and settlement, in good faith and with due regard for the interests of the principal (here, the Defendants, Southeast Floating Docks and Alan Simpson). This good faith duty of the surety covers the investigation of the claim, the decision to defend or settle the claim and, if settlement is chosen, the decision as to the amount for which to settle. The question of bad faith also involves analyzing whether the surety's conduct was reasonable under the circumstances, because unreasonable conduct can be evidence of improper motive.
>
> A claim that the settlement was excessive, that the surety was merely negligent or that the principal disagreed with the surety's handling of the claim are not sufficient to demonstrate bad faith.  Instead, the principal must establish that the surety acted with an improper motive or with a dishonest purpose. Along those same lines, evidence that a surety settled a claim to protect its own interests, by itself, is not sufficient to establish bad faith.

Neither party challenged the instruction the jury received on the surety's duty of good faith.

5

faith in handling a bond claim.[5] We agree with the *PSE Consulting* court's conclusion that "a surety's failure to conduct an adequate investigation of a claim upon a . . . bond, when accompanied by other evidence, reflecting an improper motive, properly *may* be considered as evidence of the surety's bad faith." *Id*. at 155.

We draw from *PSE Consulting* that bad faith requires an improper motive or dishonest purpose on the part of the surety. *Id*. at 152. Moreover, improper motive can be evidenced by unreasonable conduct on the part of the surety. *Id.* at 153. However, unreasonable conduct, including a negligent investigation of a claim, does not by itself constitute bad faith.[6] Rather, to give rise to an inference of bad

---

[5] In *PSE Consulting*, a surety, National Fire Insurance Company of Hartford (National), sought indemnification from the bond principal, Frank Mercede & Sons, Inc. (Mercede), for payments the surety made under the bond to the obligee, PSE Consulting, Inc. (PSE). Mercede defended on the ground the payments were not made in good faith due to National's insufficient investigation and self-interested settlement of the claim. A jury trial returned a verdict in favor of Mercede and National appealed. *PSE Consulting*, 838 A.2d at 140.

In upholding the verdict on the bad faith claim, the Supreme Court of Connecticut found the evidence from which the jury reasonably could have concluded that National performed an inadequate investigation included (1) National's failing to put in writing, as required by the surety contract, those portions of PSE's claim it considered undisputed; (2) engaging in only a superficial review of PSE's claim; and (3) waiting almost two years before referring the case to an in-house engineering expert for valuation. *Id.* at 153-54. Additionally, the jury could have inferred a self-interested settlement from evidence showing National settled the PSE claim to avoid an investigation from the Connecticut insurance commissioner, rather than to fulfill its contractual obligations to Mercede. *Id*. at 156.

[6] While bad faith requires more than a merely negligent investigation, a surety who purposefully remains ignorant of facts that would likely indicate the investigation is inadequate may be found to have acted in bad faith. *See PSE Consulting*, 838 A.2d at 155; *see also Cmty. Bank v. Ell*, 564 P.2d 685, 691 (Or. 1977) ("Although mere negligence or failure to make the inquires which a reasonably prudent person would make does not of itself amount to bad faith, if

faith, such conduct must be accompanied by other evidence of improper motive, such as a self-interested settlement. *Id.* at 155; *see also Engbrock v. Fed. Ins. Co.*, 370 F.2d 784, 787 (5th Cir. 1967)[7] ("[N]either lack of diligence nor negligence is the equivalent of bad faith: and improper motive, which is not alleged, is an essential element of bad faith."); *U.S. Fid. & Guar. Co. v. Feibus*, 15 F. Supp. 2d 579, 585 (M.D. Pa. 1998) ("[A] lack of diligence or negligence is not the equivalent of bad faith, indeed even gross negligence cannot support a finding of bad faith."). While neither evidence of an inadequate and unreasonable investigation nor a self-interested settlement standing alone would be sufficient to support a finding of bad faith, when coupled together a jury could reasonably infer a surety's improper motive. *See PSE Consulting*, 838 A.2d at 154-55.

**B.     *Southeast's Theory of Auto-Owners' Bad Faith***

A bad faith settlement requires an improper motive on the part of Auto-Owners, which can be shown by Auto-Owners' unreasonable conduct coupled with a self-interested settlement. Southeast argued to the jury Auto-Owners paid Rivermar the full amount of the bond, after performing an inadequate and

---

a party fails to make an inquiry for the purpose of remaining ignorant of facts which he believes or fears would disclose a defect in the transaction, he may be found to have acted in bad faith.").

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

7

unreasonable investigation of Rivermar's claim, with the self-interested motive of releasing itself from Rivermar's bad faith claim. Southeast demonstrated that for more than three years Auto-Owners supported Southeast's defenses to Rivermar's claim that the concrete floating dock system was defective. Auto-Owners abruptly shifted its assessment of the dock system after an in-house attorney of Auto-Owners, who was previously unfamiliar with the case, became aware of Rivermar's bad faith claim against Auto-Owners. Auto-Owners then hired an attorney, who had previously represented Rivermar's parent company, to re-examine the Rivermar claim. With only an incomplete re-examination, Auto-Owners secretly met with Rivermar and settled the claim for the full amount of the bond. Auto-Owners received a release of all claims against it, including a withdrawal of Rivermar's bad faith claim, whereas the settlement (for which Auto-Owners seeks indemnification from Southeast) did not release Southeast from any of Rivermar's claims. Southeast argued this self-interested settlement, accompanied by an unreasonable handling of Rivermar's claim, is evidence Auto-Owners did not settle in good faith.

Before turning to whether the jury reasonably could have inferred Auto-Owners settled the claim with Rivermar in bad faith, we will review the evidence presented at trial.

### III. FACTS PRESENTED AT TRIAL

Southeast manufactured and sold concrete floating docks. In August 2000, Southeast and Rivermar contracted for a concrete floating dock system for a marina project at Harbour Village Marina in Ponce Inlet, Florida (the Marina), for which Southeast was bonded by a performance bond from Auto-Owners. The concrete floating dock system was composed of billets of Styrofoam encased in a concrete shell. The billets had connecting wood walers that would rise up and down on pilings as the tide ebbed and flowed. Southeast's contract with Rivermar was only for the manufacture and delivery of the dock system, not its installation. Southeast submitted a proposal to install the dock system for $85,000, but Rivermar gave the job to another installer for $20,000.

After the dock segments were delivered and while installation was underway, Rivermar produced to Southeast a punch list of items that it claimed were defects with the dock system. Items on the punch list included improper alignment of the billets, cracking in the billets, and an insufficient amount of dock floating above the water level (insufficient "free board"). Southeast concluded the punch list items were installation issues and recommended Rivermar contact the installer. Southeast also attempted to show the installer how to remedy some of the installation issues, but the installer failed to do so because it was already paid by Rivermar and had

another job opportunity elsewhere. Citing the unresolved problems mentioned in the punch list, Rivermar refused to pay Southeast the unpaid balance of its materials, totaling $82,000. Southeast filed suit in state court for the unpaid balance in July 2001. Rivermar counterclaimed against Southeast for breach of contract and added Auto-Owners as an additional counterclaim defendant by virtue of Southeast's performance bond.

Southeast's attorney in the state court litigation was Rosemary Hayes, who had a long-standing relationship with Southeast. Stan Smith, Auto-Owners' claims manager, hired Tim Traster to represent Auto-Owners in the state court litigation. Smith later agreed to allow Hayes to also represent Auto-Owners, with Traster assuming a monitoring role and reporting to Smith and Bob Kamp, an in-house attorney at Auto-Owners.

According to Hayes, the litigation with Rivermar was extremely contentious with Rivermar fighting "tooth and nail" over "every single piece of paper." Over 1,100 pleadings were filed in the state court action, and Hayes explained she had to obtain a court order "basically to do anything." For example, Rivermar steadfastly refused Southeast access to the Marina to inspect the allegedly defective docks, and after Southeast obtained a court order for access, it discovered upon arrival at the Marina the specific finger pier that featured prominently in Rivermar's case against

10

Southeast had been moved offsite. Hayes also stated that, in addition to requiring court orders to do "anything," Rivermar would not cooperate in scheduling the hearings held in the case. Hayes testified that in her twenty years of experience, she had never seen a case with so many hearings or amended counterclaims.

Traster and Hayes discussed the litigation often. Of the thirty hearings, Traster attended all but one of them. Traster was also present for mediation and joined in Southeast's private caucus. Traster was seated behind Southeast's counsel's table the day trial was set to begin. In Traster's status reports to Smith he never indicated Hayes was inappropriately handling the litigation. In fact, Traster's reports stated there was nothing he would do differently. Traster agreed with Hayes that there was no merit to Rivermar's claim and informed Smith and Kamp in September 2003 that he did not see any exposure on the part of Southeast or Auto-Owners. In April 2004, Traster reported to Smith there had been settlement talks between Southeast and Rivermar. Consistent with Traster's and Hayes' impressions of the weakness of Rivermar's case, Auto-Owners did not require collateral from Southeast and maintained an internal reserve of only $5,000 through more than three years of litigation. Indeed, Auto-Owners did not raise its reserve or demand collateral even after Rivermar, in July 2003, filed a civil remedy notice

11

with the Florida Department of Insurance claiming Auto-Owners was acting in bad faith in refusing to settle its bond claim.

With respect to the factual strength of Southeast's defense, Alan Simpson, Southeast's president, testified regarding other likely causes for Rivermar's claimed defects in the dock system.[8] Simpson testified the floating dock system must be maintained for the life of the marina. The rods and bolts connecting the dock segments must be periodically retightened, as the treated lumber of the walers on top of the concrete floats would often shrink. The rods should be tightened with hand pressure rather than an air gun because overtightening the bolts could cause the concrete to crack. Simpson testified the dock system at the Marina was not properly installed, was left incomplete, and was not properly maintained. In response to opposing counsel's questioning about a dock report in 2003 that found excessive cracking, Simpson testified: "I wouldn't doubt it if it had been sitting there without any maintenance or ever being installed, through hurricanes and all that. They're lucky they've got it at all."

---

[8] Southeast manufactured a number of other docks including the Naval Academy at Annapolis, Maryland; a submarine base at New London, Connecticut; the Eco-swim with dolphins at Freeport, Bahamas; Grandview Hotel in Tampa, Florida; and Maritime Trade Center in Savannah, Georgia. Simpson testified that prior to Rivermar's claim of poor quality control and defective docks there had not been any quality control problems with Southeast's docks.

The trial of the state court action was set to begin May 14, 2004. Hayes testified she was prepared to try the case for Southeast. However, as the jury was being selected, Rivermar requested a continuance. Hayes opposed the continuance arguing it was not necessary. Nonetheless, the trial was continued.

Auto-Owners shifted its position on the Rivermar claim in September 2004. Tom Froman, assistant vice president in Auto-Owners' legal department, received a call from Fred Pinckney, general counsel for Rivermar's parent company, ASI, regarding Rivermar's claim. Pinckney criticized Hayes' handling of the state court case and warned Froman that Auto-Owners faced a significant bad faith claim from Rivermar. Froman had not been involved in the litigation between Rivermar and Southeast and was unaware of the matter, even though Southeast's bond was a construction bond and Froman was involved in most of Auto-Owners' construction bond litigation. In fact, Froman testified he first learned of the Rivermar claim from Pinckney. After the initial phone call, Pinckney and Froman began communicating with each other via letter. Pinckney continued to complain to Froman about Hayes' handling of the case.[9] On October 26, 2004, four days after

_____

[9] In one of the letters Pinckney sent to Froman, Pinckney included excerpts of a transcript of one of the hearings in the case. Froman testified he did not contact Traster about Pinckney's assertions, did not request a copy of the complete transcript to determine the context of the statements, and did not know Traster had attended the hearing and had reported on it to Smith.

receiving additional correspondence from Pinckney and without performing an investigation of his own, Froman raised the reserve from $5,000 to $800,000.

From his discussions with Pinckney, Froman became concerned about Rivermar's bad faith claim. Froman hired Tom Crafton, an attorney with expertise in bad faith litigation, to investigate Rivermar's claim. Crafton, however, had substantial connections with ASI. He represented ASI in litigation in 2002 and 2003. For years, Crafton had been co-counsel with an attorney who litigated for ASI in federal court around the country. A partner in Crafton's law firm represented a company owned by Fred Treadway, the largest shareholder of ASI, in asbestos litigation. Another of Crafton's law partners represented a company owned by Mark Mueller, the president of Rivermar and ASI's second largest shareholder, in more than twenty cases.

In October 2004, Kamp called Hayes to tell her Auto-Owners would be sending someone to her office to review her case file. Hayes agreed, but she testified she was curious why Auto-Owners would be sending someone to review her files at this time, because Rivermar had been offering to pay Southeast to settle the case. Kamp told Hayes that Pinckney at ASI contacted Auto-Owners about the bad faith claim and Auto-Owners wanted to send someone to review Hayes' files.

14

Crafton arrived at Hayes' office in mid-November 2004. Hayes had assembled her case files, including depositions, transcripts, notebooks, pleading clips, and correspondence. Hayes talked with Crafton for about an hour, explaining Southeast's theory of the case as well as the case history. During the discussion, Hayes asked Crafton if he had ever heard of ASI, Rivermar's parent company. Hayes testified that in response, Crafton shook his head no.

Hayes left Crafton alone in the conference room to review the materials and determine what files he wanted to have copied. Hayes believed it would have taken someone two or three days to go through all of the materials; however, Crafton emerged from the room thirty minutes later, after flagging several items, including deposition transcripts and pleadings, he wanted copied. Crafton also wanted a copy of Southeast's current financial statements, which indicated to Hayes that Auto-Owners was assessing Southeast's ability to indemnify Auto-Owners if it paid on the bond. Hayes testified she was convinced "the entire reason Mr. Crafton came to my office was because there was a bad-faith claim potential by Rivermar."

Hayes meanwhile continued her representation in the state court case. She had obtained a court order, over Rivermar's objections, allowing her to depose Rivermar's engineer who had knowledge of the maintenance and remedial work performed on the docks. Hayes testified the engineer's deposition was important

15

because Rivermar had completely denied Southeast any access to the dock site and Southeast had not seen any of the repairs that were allegedly performed on the docks or their current condition. On December 7, 2004, in preparing for the deposition, Hayes reviewed the engineer's log on the daily activities at the dock site, which Hayes received pursuant to a court order. She was surprised to learn that a week earlier, on December 1, Crafton and an engineer, Greg McLellan, had visited the dock site. Hayes was surprised because she did not know anything about the meeting and she "never could get anywhere near the site." The engineer's log also revealed the inspection was attended by Mueller, Treadway, and ASI's New York attorney, Ken Bloom. Hayes asked Rivermar's engineer about the inspection. He said he could not tell Hayes anything about the inspection, including what occurred, what was discussed, or if any tests had been performed, because those in attendance had signed confidentiality agreements. Hayes attempted to contact Crafton and Froman about the December 1 meeting, but they did not return her phone calls.

After learning about the December 1 site visit and the confidentiality agreement, and because of the difficulty Hayes experienced in contacting Auto-Owners, Hayes started to become "deeply concerned" about Crafton. Based on the connections between ASI, Crafton, and others in Crafton's firm, Hayes testified she

16

"was deeply concerned that [Crafton] had ulterior motives" and was "concerned that [Auto-Owners] had brought Mr. Crafton in this in an attempt to settle the case." Hayes sent a letter to Traster alerting him to her concerns with Crafton.

Hayes later learned Rivermar had listed McLellan, Auto-Owners' engineer who accompanied Crafton to the dock site inspection, as an expert and lay witness for Rivermar in the state court case. Hayes was never able to obtain McLellan's opinions or findings. She subpoenaed McLellan to appear for deposition, but counsel for Auto-Owners instructed him not to answer her questions. Southeast first learned McLellan's opinions at trial on the indemnity claim, at which time he testified he neither performed any calculations or evaluations of the free board (the distance between the top of the floating dock segment and the water level) of his own on the docks nor reviewed any of Rivermar's dock maintenance records. Rather, he reviewed the calculations in another engineering report, and he inspected the docks while walking around the Marina with Crafton and representatives from Rivermar and ASI on December 1, 2004.

McLellan visited the dock site three years after the docks were installed by another contractor and after three hurricanes had come through Florida. During his site visit McLellan noted an unspecified amount of the dock had been renovated or replaced because he saw another manufacturer's name on a pier segment. His only

17

structural analysis of the dock was performed on one cross section of (what

Rivermar told him was) a Southeast floating dock, which had been removed from

the water and dissected by Rivermar under unspecified conditions.

A month after the site visit, in January 2005, McLellan gave Crafton his

preliminary opinions based on the documents he had reviewed, but he said he had

wanted more information. McLellan's preliminary opinion was that the problems

with the docks were manufacturing defects. Moreover, based on his review of the

other engineering report, McLellan concluded the docks were not constructed to the

contract specifications and thus were defective.

Froman, in January 2005, again raised the reserves, this time to $956,987, the

full amount of Southeast's bond. Also, for the first time, Froman demanded

collateral from Southeast in the amount of the bond. According to the indemnity

agreement between Auto-Owners and Southeast, Auto-Owners could settle any

claim against the bond unless Southeast requested in writing that Auto-Owners

litigate the claim and Southeast, simultaneously with the request, deposited

collateral with Auto-Owners.[10] When Auto-Owners made a written demand for

---

[10] Paragraph 6 of the indemnity agreement provides liability extends to any and all amounts "paid in good faith by the surety" in settlement of any claim, "under the belief" that it was liable, whether liable or not. While a surety generally has wide discretion in settling the claims made on a bond, even when the principal is not liable for the underlying claim, such discretion is not unfettered. Under the terms of the indemnity agreement, Auto-Owners would be entitled to indemnification only for payments made in good faith.

collateral in January 2005, Hayes and Traster discussed a number of options for posting collateral; Southeast offered to post a bond, offered a letter of credit, offered to deposit monies in Traster's trust account, and offered to give Auto-Owners a lien on property. The collateral discussions continued over several months, and Auto-Owners did not accept any of these options. Meanwhile, Pinckney continued to correspond with Froman about the state court action and about the bad faith claim. Less than a week after one such communication, Froman instructed Kamp and Smith not to talk with Hayes.

Thereafter, Auto-Owners' attorney (Crafton) and ASI's attorney (Bloom) coordinated a meeting between representatives from Auto-Owners and representatives from Rivermar and its parent company, ASI, at Crafton's office in Louisville, Kentucky, on March 28, 2005. This meeting between Auto-Owners and Rivermar was kept secret from Hayes and Southeast. E-mail exchanges between Crafton and Bloom prior to this meeting suggest Hayes was excluded from the meeting so she did not "throw a monkey wrench into it." Froman indicated the meeting in Louisville was a "civil meeting" between the parties. The day after the meeting, McLellan made a note regarding his upcoming review of the mooring analysis and calculations on the dock system that stated "Discussed with Tom Crafton. Not needed at this time."

On April 4, 2005, Hayes sent a letter to Auto-Owners requesting, pursuant to the indemnity agreement, that Auto-Owners not settle with Rivermar and continue defending the state court action. At the time of Hayes' April letter, Auto-Owners' collateral demand from January stood at $956,987, the full amount of the bond, and Southeast offered to put the full amount into escrow in Traster's trust account. Three days later, on April 7, 2005, Froman responded by increasing the demand for collateral from $956,987 to $3 million.

Auto-Owners settled with Rivermar the following month by paying Rivermar the full amount of the bond. According to Froman, the settlement with Rivermar was motivated mainly by the claim on the docks and the claim for attorneys' fees, but also by Rivermar's bad faith claim. Auto-Owners received a release of all claims against it, including a withdrawal of the bad faith claim Rivermar had asserted with the Florida Department of Insurance. The settlement, for which Auto-Owners sought indemnification from Southeast, did not release Southeast from any of Rivermar's claims. Froman testified he was not aware Rivermar had offered to pay $100,000 to Southeast to settle the case, and testified it would "not necessarily" have made any difference to him. ASI's attorney, Bloom, testified Rivermar had indeed offered to pay Southeast to settle the dispute.[11]

---

[11] In February 2007, eight months after the trial on Auto-Owners' indemnity claim, Rivermar settled all claims in the state court case with Southeast by paying it $499,999.

20

## IV. DISCUSSION

Based on these facts the jury heard, we next consider the reasonable inferences the jury could have drawn that would support the jury's verdict. In determining whether or not reasonable jurors could have concluded Auto-Owners settled with Rivermar in bad faith, we consider whether the evidence supports an inference of an unreasonable and inadequate investigation, as well as a self-interested settlement of the claim.

We begin by observing Southeast presented no smoking gun evidence Auto-Owners settled with Rivermar in bad faith. Southeast presented only circumstantial evidence of Auto-Owners' bad faith. Nevertheless, the jury could reasonably have aggregated inferences from this circumstantial evidence to find by a preponderance of the evidence Auto-Owners did not settle with Rivermar in good faith.

### A. *Reasonableness of Auto-Owners' Investigation and Handling of the Rivermar Claim*

The jury heard evidence from which it could have concluded Auto-Owners performed an unreasonable and inadequate investigation. Froman ignored the assessment of those who had been involved with the claim for more than three years, including Auto-Owners' independent monitoring attorney (Traster), in-house attorney (Kamp), and claims manager (Smith). The collective impression of those who had been involved in the case since its inception was that there was no

21

exposure on the bond. Froman disregarded the investigation performed by Auto-Owners' representatives and credited Rivermar's investigation and assessment of the case.

Also, the Rivermar claim against the bond was not likely to succeed, and it was unreasonable for Auto-Owners to settle for the full amount of the bond when Auto-Owners was advised Rivermar would end all of the litigation for the payment of money to Southeast. On the eve of trial that was scheduled for May 2004, but was continued at the last minute, Rivermar offered to pay money to Southeast to settle the case. Southeast's attorney and ASI's attorney both testified Rivermar had offered to pay Southeast to settle the dispute. Southeast's attorney and Auto-Owners' monitoring attorney both concluded there was no exposure on the part of Southeast or Auto-Owners from Rivermar's claim.

The jury could reasonably have concluded that it was not only unreasonable for Auto-Owners to summarily disregard its own initial investigation that indicated the Rivermar claim was not likely to succeed, but also unreasonable for Auto-Owners to conduct an inadequate investigation before settling with Rivermar. First, the attorney Froman enlisted in November 2004 to investigate the claim was tainted by a conflict of interest and therefore unreliable. Hayes testified Crafton himself, as well as other partners in his law firm, had a preexisting attorney-client relationship

22

with ASI or its principal shareholders.  Hayes also testified Crafton indicated to her he had never heard of ASI.  Crafton attended trial before the district court as counsel for Rivermar, but did not testify in rebuttal of Hayes' testimony.  The jury reasonably could have concluded Hayes' testimony was true and Crafton disingenuously denied familiarity with ASI.

Second, Crafton's investigation was cursory.  In November 2004 Crafton and Hayes talked about the case for about an hour, and then Crafton reviewed Hayes' files for half an hour.  Hayes testified it would have taken someone two or three days to thoroughly go through all of the files and "the entire reason Mr. Crafton came to my office was because there was a bad-faith claim potential by Rivermar." In mid-November 2004 Crafton contacted McLellan and arranged to have him visit the dock site and inspect the docks.  Crafton never informed Hayes of this site inspection, and the parties at the inspection signed a confidentiality agreement prohibiting disclosure of any information exchanged at the meeting.  As of December 1, 2004 when Crafton and McLellan visited the dock site, Rivermar had not allowed Hayes or Southeast's experts on the premises to inspect the docks.  The jury could have inferred Crafton gained access to the dock site and met with ASI representatives, when Hayes had experienced substantial resistance, because

23

Crafton had a preexisting and favorable relationship with ASI and, consequently, his investigation and assessment of the claim was tainted by that relationship.

In addition to concluding Auto-Owners' investigation of the claim was colored by Crafton's friendliness with ASI, the jury could have concluded it was also inadequate. McLellan testified he did not perform any calculations or evaluations of his own on the docks and he never reviewed Rivermar's dock maintenance records. Southeast's president testified maintenance was critical because during the first year all rods holding the docks in place must be retightened because of shrinkage of treated lumber. A review of Rivermar's dock maintenance records by McLellan would have been important because those records would have established if Rivermar performed any maintenance of the docks after they were installed. The jury could have inferred Auto-Owners secretly settled with Rivermar before its engineer had fully and adequately investigated the claim and thus it was unreasonable for Auto-Owners to rely on its engineer's incomplete investigation of the docks as a pretext for settling the claim with Rivermar.

The jury could have inferred Auto-Owners' demands for collateral from Southeast were intended to thwart and undermine Southeast's attempt to litigate the claim, which would have impeded Auto-Owners' settlement of the bad faith claim. During the first three years of Auto-Owners' investigation of Rivermar's claim,

24

Auto-Owners concluded there was no reasonable risk of liability and did not seek any collateral from Southeast. In January 2005, Auto-Owners demanded Southeast deposit cash equal to the full penal sum of the bond in the amount of $956,978 within five days. Hayes testified she had many discussions during that time about posting collateral and Auto-Owners did not respond to Southeast's offers. Three months later, on April 4, 2005, Hayes asked Auto-Owners if it was attempting to settle the Rivermar claim, and at that time Southeast offered to put the full sum of the bond in Traster's trust account. Three days later, Auto-Owners demanded Southeast post $3 million in cash with Auto-Owners. Auto-Owners offered no explanation why its demand for collateral increased more than threefold to $3 million when Southeast offered to satisfy its demand for collateral equal to the sum of the surety bond. The jury could have inferred Auto-Owners' collateral demands were precipitated by Auto-Owners and Rivermar's agreement in principle to settle the claim at the March 28th meeting in Louisville, and if Southeast had satisfied the demand for collateral, Auto-Owners could not have settled the claim without Southeast's consent. Thus, the jury could have concluded Auto-Owners' collateral demands were unreasonable and in bad faith.

In sum, the jury could have found from the evidence (1) Froman unreasonably ignored the investigation and assessment of Auto-Owners' own

employees as to the merits and strength of the claim on the bond, (2) Rivermar's claim against the bond was weak and therefore settlement for the full amount of the bond was unreasonable, (3) Crafton had a bias friendly to Rivermar and relying on his investigation and assessment of the claim was unreasonable, (4) McLellan never completed his investigation and reliance on his preliminary opinion was unreasonable, and (5) Auto-Owners' demand for a threefold increase in collateral, without explanation, was unreasonable. While evidence of an unreasonable and inadequate investigation and handling of a claim, standing alone, may be insufficient to support a finding of bad faith, the jury in this case also heard evidence to support an inference Auto-Owners had an improper and self-interested motive to settle the claim.

## B. *Auto-Owners' Motive for Settling the Rivermar Claim*

The jury heard evidence to support an inference Auto-Owners intended to eliminate its risk of a bad faith claim, with Southeast's money. Auto-Owners shifted its position on the bond claim immediately following the direct threat of Rivermar's bad faith claim. Froman, Auto-Owners' in-house attorney responsible for reviewing all surety bond claims, first learned of the claim in September 2004 when Pinckney, the general counsel of Rivermar's parent company, ASI, called. Froman did not know about Rivermar's claim against the bond or Rivermar's bad

faith claim against Auto-Owners until the phone call from Pinckney. Because of this direct communication, Froman became concerned about the bad faith claim by Rivermar. Froman increased Auto-Owners' reserve from $5,000 to $800,000 in October 2004, after Pinckney's contact with Froman, but prior to Auto-Owners' re-investigation of the claim. Auto-Owners initially supported Southeast's defenses against Rivermar's claims on the bond, and their position changed only after Froman learned of the bad faith claim. The jury could have concluded Auto-Owners' change of position and settlement of the claim on the bond was prompted by its self-interested concern about Rivermar's bad faith claim.

The secretive nature of the negotiations between Auto-Owners and Rivermar also lends support for the jury's verdict. The jury heard evidence that would support an inference Auto-Owners' and Rivermar had reached a settlement in principle at the March 28, 2005 secret meeting in Louisville. The day after, McLellan was instructed to abandon his review of the mooring analysis and calculations on the dock system. The jury could have concluded Auto-Owners and Rivermar had reached a settlement in principle and Auto-Owners excluded Hayes and Southeast so they would not "throw a monkey wrench" into the settlement.

The jury also heard that Auto-Owners and Rivermar's settlement excluded Rivermar's claims against Southeast, while it released the claims of bad faith

27

against Auto-Owners. The jury could have concluded Auto-Owners would have obtained a release of claims against both it and Southeast if the payments made to Rivermar indeed had been in settlement of Rivermar's claim against the bond, as opposed to settlement of Rivermar's bad faith claim. The jury reasonably could have concluded the failure to obtain a release of claims against Southeast, by payment of money Auto-Owners intended to recoup from Southeast, is evidence the settlement reached was not for the claims against the bond.

Whether a surety has settled a claim in good faith or not, of course, depends on the particular facts of the case. *See Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.*, 483 F.3d 1265, 1276 (11th Cir. 2007). It is the province of the factfinders to assess the credibility of witnesses and draw reasonable and logical inferences from the evidence. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997). As outlined above, the verdict reached by the jury was supported by the evidence presented at trial.

## V.   CONCLUSION

Based on the evidence presented to the jury, the district court's grant of a new trial was an abuse of discretion. The jury reasonably could have found Auto-Owners settled the claim to avoid an exposure greater than the full sum of the bond due to the bad faith claim by Rivermar. The jury also reasonably could have found

28

Crafton's investigation was tainted by his preexisting relationship with Rivermar's parent company and was simply a sham to mask the settlement of the bad faith claim. We therefore REVERSE the grant of a new trial and REMAND to the district court to enter a judgment reinstating the jury verdict in favor of Appellants Southeast Floating Docks, Inc., and Alan Simpson. [12]

**REVERSED AND REMANDED.**

---

[12] Because we find the motion for new trial was improperly granted, we need not reach Appellants' argument that the district court erred in granting Auto-Owners' motion for summary judgment as to Southeast's liability.